# EXHIBIT O

# In The Matter Of:

*Darrin VanPelt v*
*Aaron Layne and City of Detroit*

---

*Steven Ashley*
*Vol. I*
*April 12, 2022*
*Steven Ashley*

---

*Court Reporting Services*
*Oakland County, Clarkston, Michigan*
*www.courtreportingservices.org*

Original File Ashley, Steven.txt
Min-U-Script® with Word Index

Case 3:21-cv-10352-RHC-EAS   ECF No. 46-16, PageID.1289   Filed 05/11/22   Page 3 of 33

Darrin VanPelt v
Aaron Layne and City of Detroit

Steven Ashley

Steven Ashley - Vol. I
April 12, 2022

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE EASTERN DISTRICT OF MICHIGAN
 3
 4           *         *         *         *         *
 5
 6
 7  DARRIN VANPELT,
       Plaintiff,
 8                                Case No. 2:21-CV-1-352
    - vs. -                       Hon. Robert H. Cleland
 9
10  AARON LAYNE, and
    CITY OF DETROIT,
11       Defendants.
12  _____/
13
14              VIDEOCONFERENCE DEPOSITION OF
15  DEPONENT:    STEVEN D. ASHLEY
16  DATE:        Tuesday, April 12, 2022
17  TIME:        9:59 a.m.
18  LOCATION:    Videoconference via Zoom
19               Michigan
20
21  REPORTED BY:  JENNIFER CLAUSON, CSR-6867
22               Court Reporting Services
23               courtreportingservices@ymail.com
24
25
```

**Page 2**

```
 1  APPEARANCES:
 2
 3  AMY DeROUIN, ESQUIRE
 4  Christopher Trainor & Associates
 5  9750 Highland Road
 6  White Lake, Michigan 48386
 7  (248) 886-8650     E-mail: amy.derouin@cjtrainor.com
 8           Appearing on behalf of the Plaintiff.
 9
10  GREGORY PADDISON, ESQUIRE
11  City of Detroit Law Department
12  2 Woodward Avenue, Suite 500
13  Detroit, Michigan 48226
14  (313) 237-0435     E-mail: paddisong@detroitmi.gov
15           Appearing on behalf of the Defendants.
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1                    {I N D E X}
 2  WITNESS                              PAGE
 3       STEVEN D. ASHLEY
 4  Examination by Ms. DeRouin............4
 5  Examination by Mr. Paddison..........106
 6  Re-examination by Ms. DeRouin........117
 7
 8                *   *   *
 9
10  E X H I B I T S            PAGE # MARKED
11  Deposition Exhibit No. 1..........5, 6, 9
12  Deposition Exhibit No. 2..........9, 10
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1  Videoconference via Zoom, Michigan
 2  Monday, April 12, 2022
 3  At or about 9:59 a.m.
 4             *   *   *   *   *   *
 5          STEVEN D. ASHLEY
 6  Having been first duly sworn by the Notary Public
 7  to tell the truth, the whole truth, and nothing
 8  but the truth, testified upon his oath as follows:
 9             EXAMINATION
10  BY MS. DeROUIN:
11  Q. Can you state your name for the record?
12  A. Steven, S-T-E-V-E-N, D, like in David, Ashley,
13     A-S-H-L-E-Y.
14  Q. Okay. Mr. Ashley, you've given several depositions in
15     your career as an expert, correct?
16  A. That's true, yes.
17  Q. And I think your CV reflects maybe, I think, you've
18     testified at about 47 hearings and deps and so forth,
19     correct?
20  A. Yes. And there are two recent additions.
21  Q. Okay.
22  A. Which I've provided to Greg and I'm sure he'll forward to
23     you.
24  Q. I'll ask you about that just briefly in a second, but, I
25     guess, what I'm getting at, sir, is you know the ground
```

Page 5

1  rules today pretty loud and clear, correct?
2  A. Yes.
3  Q. Okay. And have you given any Zoom depositions, have you
4  taken advantage of this Pandemic opportunity?
5  A. Yes, at least once, maybe twice. No, just once.
6  Q. Okay.
7  A. Just once.
8  Q. And I think --
9  A. Excuse me.
10 Q. You're okay. And I think the only added rule I'm going to
11 say is that we can't talk over each other. You're going
12 to probably see from time to time I'm a fast talker and I
13 will try very hard to slow it down, especially for a Zoom
14 deposition because if I get the yellow box and you have
15 the yellow box at the same time, the court reporter's not
16 going to know who's saying what to who. So I will do my
17 best to slow it down, ask a complete question, and allow
18 you to give a full answer, okay?
19 A. Sure.
20 Q. Okay. I'll afford you that same courtesy. I'll let you
21 get your whole answer out before I ask the next follow-up
22 question, but, I guess, other than that, I think we talked
23 about two seconds before we went on the record, I was
24 saying I'm going mark as Exhibit 1 your CV, your
25 professional resume. Do you have that before you today?

Page 6

1  A. Yes, I do.
2  Q. Okay. And it looks like I received this CV at the end of
3  December, it looks like. The reports dated December 23rd,
4  2021 and it was attached to your report. All I'm asking,
5  Mr. Ashley, is this the most recent current CV that you
6  have or did you update it since the end of December of
7  2021?
8  A. I have updated it, yes.
9  Q. Okay. Can you tell me, because I haven't been provided
10 the updated CV, can you tell me what updates you made to
11 it, just by page and my first page of your CV is page 61
12 of your report. So if you wanted to just give me a page
13 number that you made those changes and what I would like
14 to do, I would assume, Greg has no objections.
15        MS. DeROUIN: Jenny, the Exhibit 1 that I sent to
16 you, given that it's not current, we're going to have Mr.
17 Ashley e-mail it to Greg and Greg will send you the most
18 current Exhibit 1, okay? Thanks.
19        MR. PADDISON: Yep.
20 A. Okay. Ms. Amy, do you want me to go ahead and manually
21 give you the updates?
22 Q. (BY MS. DeROUIN): Yeah, that would be great because I
23 don't have a copy of it unless you got -- I mean, how many
24 updates do you have? Let me ask that before I go. 15 or
25 you got like under five or --

Page 7

1  A. Just a couple.
2  Q. Sure. Perfect, thanks, Mr. Ashley, go ahead.
3  A. Yeah, at the top of page two.
4  Q. Which would be 62?
5  A. Yes.
6  Q. Okay.
7  A. I'm sorry.
8  Q. You're okay. Okay.
9  A. See where it says first bullet earned and received
10 certification.
11 Q. Yes.
12 A. Okay. I've added one item to that which is --
13 Q. Yep.
14 A. Which is certified use of force instructor slash analyst
15 and that is through the Legal and Liability Risk
16 Management Institute, typically referred to LLRMI.
17 Q. Okay. And when did you -- and what timeframe were you
18 able to add that certification? Was it this year in 2022
19 or when did you add that?
20 A. It was literally just last week actually.
21 Q. Oh, okay.
22 A. Yes. And then if you flip over to, let's see. I guess,
23 on top, it would be page 68 under instructor armor
24 certifications.
25 Q. Mm-hm.

Page 8

1  A. I added that same line.
2  Q. Okay. Use of force instructor and analyst?
3  A. Yes. Certified use of force instructor slash analyst
4  LLRMI. And then -- went the wrong direction. Sorry.
5  Page -- sorry. I'm having an allergy morning. So excuse
6  me for --
7  Q. That's okay.
8  A. -- coughing in your ear.
9  Q. Take your time, drink your water. I don't care.
10 A. Let's see. Page 66 under expert case consultation.
11 Q. Yep.
12 A. You'll note the last sentence it says testified as an
13 expert at deposition hearing or trial 50 times in 43
14 cases. That is updated to 52 times in 45 cases.
15 Q. Are you counting this one or are we going to do another
16 amendment in the next case?
17 A. That doesn't count this one.
18 Q. Okay.
19 A. I believe, those are the only updates.
20 Q. Okay. Then --
21 A. Also --
22 Q. Go ahead.
23 A. I'm sorry. I've also added those last two cases to my
24 case list.
25 Q. Okay. In the case list, where was -- where would I find

Page 9

1    the case list at, your case list?
2  A. Toward the end of the report on page -- let's see here.
3  Q. 82?
4  A. 82.
5  Q. Beginning on 82, sir?
6  A. Yes, page 82.
7  Q. Okay. Okay. So with that being said, we're going to mark
8     as Exhibit 1 your amended CV and that will be defense
9     counsel provide that to the court reporter and we'll move
10    on, okay?
11 A. Yes.
12 Q. Okay. Now, I also am going to mark as Exhibit 2 your
13    26-page report dated December 23rd of 2021. Do you have
14    that before you?
15 A. Yes, I do.
16 Q. Okay. Aside from the report in this case, have you
17    written any other reports or affidavits, supplemental
18    reports, supplemental affidavits, anything that would
19    offer any additional opinions in this case that are not
20    contained in your December 23rd, 2021 report?
21 A. No.
22 Q. Okay. As you sit here today, sir, do you intend to draft
23    any supplemental reports or affidavits offering any
24    additional opinions in this case?
25 A. As I sit here today, no. If I'm asked to, of course, I

Page 10

1    will.
2  Q. Okay. Up until today, and you're talking to me today,
3     have you been asked to by defense counsel to add any
4     additional opinions or make any supplements or amendments?
5  A. No.
6  Q. And, of course, I'm sure in preparing for your deposition
7     today, that you have had time to recently review your
8     26-page report, correct?
9  A. Yes.
10 Q. Okay. Are there any changes whatsoever, no matter how
11    minuscule or not, that you would like to be made to this
12    amendment, anything like that, with regard to your 26-page
13    report marked as Exhibit 2?
14 A. No.
15 Q. Did you have an opportunity to review Mr. Katsaris' expert
16    report in this case?
17 A. Yes.
18 Q. And did you have an opportunity to review Mr. Katsaris'
19    deposition transcript that was taken in this case a couple
20    weeks ago?
21 A. I believe so. I don't remember specifically, but I
22    believe, I did, yes.
23 Q. Okay. Is there anything from reading the report or
24    reading Mr. Katsaris' deposition transcript that you would
25    want to make changes or supplementals to your report based

Page 11

1    on what you read from Mr. Katsaris?
2  A. Other than the fact that I don't agree with him, which, I
3     guess, is normal, no changes to my report.
4  Q. Okay. Looks like from your report, you indicated that you
5     were retained by defense counsel in this case on July
6     27th, 2021. You reference that it was, quote, for the
7     purpose of providing review, analysis, and opinions
8     regarding allegations made against certain officers of the
9     Detroit, Michigan police department in the City of
10    Detroit. I'm just asking for clarification. Other than
11    the actions of the named Defendant Aaron Layne, which
12    other officers, if any, were you referring to when you
13    mentioned other certain officers?
14 A. Primarily Officer Layne. You know, initially, I was asked
15    to look at everything, which is what I intended to
16    indicate by that statement and there was another officer
17    that came to the scene, but in terms of the actual
18    specific actions and the use of force, really just Officer
19    Layne.
20 Q. Okay. And the other officer that came to the scene was
21    Darryl Bennett, correct?
22 A. Yes.
23 Q. Okay. But in general, just so I understand it with
24    respect to your analysis and your review and consultation
25    and offering of opinions, those opinions are based -- were

Page 12

1    done based on Defendant Layne and his actions, correct?
2  A. Yes.
3  Q. Okay. You don't have an opinion one way or the other with
4     regard to any action or inaction taken by Darryl Bennett
5     in this case, do you?
6  A. No.
7  Q. Okay. It looks like also, of course, you've been paid to
8     provide these expert services in this case just like any
9     other expert would in any other case. It looks to me I
10    didn't receive any type of fee agreement other than what's
11    stated in your report. Can you tell me how much you've
12    been paid for your work, expert work, done on this case as
13    of the date of this writing?
14 A. Actually, yes, going -- okay, Greg. Going through my file
15    last night, I discovered that I had not billed the City
16    for this case.
17 Q. Oh, boy.
18 A. That managed to fall through the cracks, but I will. I
19    just haven't yet. So as of today, I haven't, other than
20    your fee, which you graciously provided to me ahead of
21    time, I have not been paid anything for this case.
22 Q. Okay. And just for the record, my fee would be the
23    deposition fee that you charged per the hour for the
24    deposition for today, correct?
25 A. That's correct, yes.

Case 3:21-cv-10352-RHC-EAS  ECF No. 46-16, PageID.1292  Filed 05/11/22  Page 6 of 33

Darrin VanPelt v
Aaron Layne and City of Detroit

Steven Ashley

Steven Ashley – Vol. I
April 12, 2022

Page 13

1 Q. Okay. And then even though you haven't billed the City of
2    Detroit yet for any expert services done on this case, you
3    will, correct?
4 A. That's correct, yes.
5 Q. Okay. And I just ask that once you do that billing, if
6    you could provide, of course, you're going to provide it
7    to defense counsel for payment, but I just ask the defense
8    counsel will supplement and provide that the on me, okay?
9        So I take it just to answer my second
10    question, you don't have any invoices or anything in your
11    file that will reflect any type of work done on this case
12    to today's date, correct?
13 A. That's correct, yes.
14 Q. Okay. And my understanding, of course, sir, that you're
15    currently employed as an expert witness, correct?
16 A. Among other things, yes.
17 Q. Yep, and that's what I was going to ask you. Is there any
18    other capacity that you work currently for income other
19    than being an expert witness or police procedures expert
20    witness?
21 A. On occasion, I do training, risk management assessments,
22    but essentially, I'm retired. So in terms of actual
23    income, I supplement my retirement income with my expert
24    witness work.
25 Q. Sure. And I can look at your CV, but just I can ask you,

Page 14

1    I think, it's easier talking to you versus looking at a
2    CV, where do you retire from, sir?
3 A. Sort of collectively.
4 Q. Okay.
5 A. I retired from the Livingston County Sheriff's Department
6    in 1989 and then I worked 12 years as a risk management,
7    risk control, loss control specialist working with various
8    insurance programs, the Municipal Legal, the MMRMA, and
9    one of the programs -- one of the company that actually
10    doesn't do work in Michigan, and those are all listed on
11    my CV. And then --
12 Q. Okay.
13 A. And then about 2000, I decided, you know, it's time to
14    just do my own thing. So I taught -- you know, at various
15    times, I taught for Taser International, I taught for
16    Concordia University. Sort of a loose collective
17    retirement, if you know what I mean.
18 Q. Sure. Sure. In the last year for income have -- in the
19    last year since we're kind of new into 2022, so let's do
20    2021. In 2021, sir, have you obtained or -- yeah, have
21    you earned any income for any training or risk management
22    assessments that you've done?
23 A. I don't recall any. 2021 with COVID and everything was
24    kind of a strange year and I stopped teaching at Concordia
25    spring of 2021. So there would be a little bit at the

Page 15

1    very beginning of the year, but other than, no.
2 Q. Okay. Can you tell me ballpark as far as your when the
3    last time you received any income or earned any income
4    from any training courses you've done, a risk management
5    assessment you've done in the last, I don't know, five
6    years?
7 A. I would only be guessing. Risk assessments I don't do
8    that often anymore. Frequently, that's, you know, police
9    chief calls me and says would you look at something for me
10    and I just do it. In terms of training once I started
11    teaching at Concordia, I pretty much stopped other outside
12    training. Of course, if somebody calls me and wants me to
13    come in and do some training, I will.
14 Q. Sure.
15 A. It was generally, you know, random. It wasn't any
16    specific contract I had or anything like that, but I don't
17    recall anything specific.
18 Q. In the last five years?
19 A. Off the top of my head, I don't recall anything specific,
20    no.
21 Q. Okay. And just so we're clear, in the last five years
22    correct, sir?
23 A. That's correct, yes.
24 Q. Okay. I guess, in general with regard to training, and I
25    know you're CV reflects you're an instructor in many

Page 16

1    areas, can you tell me when the last time you have done or
2    conducted any formal training?
3 A. I make presentations. With COVID, that's been kind of
4    reduced, but it's typical that I would present at
5    conferences once, twice, perhaps three times a year
6    depending on the conference. The last time I actually did
7    any specific presentation was in March at the ILEETA
8    conference and that's listed in my CV.
9 Q. Mm-hm.
10 A. As a matter of fact, now that you mention it, that is an
11    additional update to the CV.
12 Q. Okay. So ILEETA is the International Law Enforcement
13    Educators and Trainers Association, correct?
14 A. And trainers association.
15 Q. Yep. Okay. And you said you presented at a conference
16    ILETTA and I know you said it's on your CV. Would it have
17    been March of 2020 or can you tell me the year at all?
18 A. March of this year.
19 Q. March of 2022?
20 A. Mm-hm.
21 Q. That's a yes?
22 A. Yes, sorry.
23 Q. Sorry. Gotta catch those. It's all I'm doing. Greg
24    supposed to be doing that for me. Okay.
25        So I asked about training and I think how I

Darrin VanPelt v
Aaron Layne and City of Detroit

Steven Ashley

Steven Ashley - Vol. I
April 12, 2022

Page 17

1 understand it, you haven't done any type of formal
2 training as an instructor in more than five years, but you
3 said you recently presented at a conference for ILEETA in
4 March of 2022. What, I guess, in general, I know you got
5 to add that to your CV so I have an opportunity to review
6 that, but in general, what was your, you know, reason for
7 presenting at the conference, what area of I would take it
8 law enforcement training did you train on, so to speak, or
9 speak on?
10 A. I was just looking to see. This would be for you on page
11 76 and there's an addition, which has the topic of my
12 presentation and the actual gist of the presentation was I
13 want to give you -- and pardon me for flipping pages. I
14 want to give you the exact title. This head title was,
15 "Make Your People Experts, Win the Aftermath." And
16 generally, the topic was for trainers know more about the
17 aftermath of an incident, legal ramifications, what your
18 people are going to be faced with when they give a
19 deposition, types of questions that typically would trip
20 them up because they don't understand the purpose of the
21 question. The process, you know, the post-incident
22 process, dealing with interviews. Just that whole --
23 everything that happens after an incident in terms of
24 their documentation and then their response to questioning
25 and all that kind of stuff.

Page 18

1 Q. Okay. And I just want to make sure, I probably
2 misunderstood you. When you say you made a presentation
3 at the ILEETA conference, I swear you said last month, but
4 the one I have on the CV looks like the last one was done
5 on March of 2019. Are you saying you need to amend? Is
6 that the part of the amendment to your new CV of March of
7 2022?
8 A. Yes.
9 Q. Okay.
10 A. That's an additional. I forgot about that. That's an
11 additional -- additional addition.
12 Q. Okay. That's fine. And if you could think of anything
13 else during this deposition that jogs your memory, which
14 is pretty common for people, just let me know, we can go
15 back real quick.
16 A. Thank you.
17 Q. Okay. And then, of course, that would be under guest
18 lectures, sir, correct?
19 A. Yes.
20 Q. Okay. And were you provided any income as being a guest
21 lecture for that ILEETA conference?
22 A. No, the conference fee is waived for presenters, but other
23 than that.
24 Q. Okay. You're a member of ILEETA, correct?
25 A. That's correct, yes.

Page 19

1 Q. Okay. So what I get from the last five years, I
2 understand you have a retirement income, we're not going
3 there. But what I'm asking is in general, it looks like
4 in order to supplement your income as you told me earlier,
5 your work has been -- the work for income, excuse me. Has
6 been done in the expert field, correct?
7 A. Except for teaching that I did at Concordia University.
8 Q. Sure. That was -- was it rapped up last spring of 2021 or
9 spring of 2020?
10 A. I believe, it was spring of 2021.
11 Q. Okay. So other than the teaching at Concordia, what we
12 have as expert work, can you give me like as far as a
13 percentage at all, like how much of your expert work, I
14 guess, from your teaching is derived from income, like in
15 a pie chart? Is it 80 percent, 75?
16 A. It's probably, you know, it varies from year-to-year
17 anywhere from 40 to 50 percent I would think. Depends on
18 when lawyers pay their bills. Sometimes.
19 Q. Or if you bill, right? You got to bill first?
20 A. That's right. Can't believe I didn't bill.
21 Q. I'm just joking.
22 A. Yes.
23 Q. Okay. In general, can you say -- I know it's a little
24 funny given the Pandemic. I mean, Pandemics not funny,
25 but it's been funny for everybody I'm saying as far as how

Page 20

1 we are all functioning, but in general, could you tell me
2 ballpark in 2021 what your gross income was with regard to
3 expert work that year?
4 A. I would only be guessing.
5 Q. Sure. It's a ballpark.
6 A. Right. I really couldn't. I mean, I would just be
7 pulling a number out of the air and percentage wise,
8 probably 50 percent. My wife and I do our taxes together.
9 So her retirement incomes included as well. So I'm
10 guessing maybe 50 percent.
11 Q. So 50 percent of your income, sir, from 2021, would have
12 been coming from expert work on cases?
13 A. Yes, but again, that's just a seat of the pants guess.
14 Q. Okay. And did you file income taxes in 2021?
15 A. Actually, we're on an extension, so --
16 Q. Okay.
17 A. I haven't filed quite yet.
18 Q. Okay. Then I'm going to ask real quick in 2020, can you
19 tell me, same question, can you tell me a ballpark
20 approximation, estimate of what your income was for 2020
21 just speaking with regard to expert work?
22 A. It would have to be the same answer.
23 Q. Okay.
24 A. I just don't have those numbers.
25 Q. Okay. Did you file your income taxes for 2020?

Page 21

1  A. Yes.
2  Q. Okay. And, of course, your income taxes would reflect
3     that information, right?
4  A. Oh, certainly, yes.
5  Q. Okay. I learned from page 66 of your report that you've
6     been holding yourself out as a police procedures expert
7     since 1994, is that correct?
8  A. Well, that's when I had my first case. So, I guess, that
9     would be a good number. It was actually some time after
10    that when I started doing cases of this type. That first
11    case was a criminal defense case and it was undertaken for
12    an acquaintance, so --
13 Q. Okay. Let's see. Going to -- I guess, just going to page
14    66, you told me that you've amended your CV, which is
15    fair. So now, it's up to you have you testified as expert
16    in deposition hearings or trial 52 times in 45 cases,
17    correct?
18 A. Yes.
19 Q. Those additional two times that you testified for in those
20    cases were those plaintiff's case or defense cases?
21 A. They were defense cases.
22 Q. Okay. So it looks like you have about 65 percent where
23    you testified as an expert for defense cases. It may be a
24    little higher now given those extra two cases, correct?
25 A. That includes those two cases and I actually worked this

Page 22

1     up yesterday and it comes out to 64.4 percent for defense.
2  Q. Okay. So that's, of course, the calculation that you have
3     made adding those other two times, correct, in 45 cases?
4  A. That's correct.
5  Q. Okay. Is there any particular reason why it seems like
6     the majority of your cases are for the defense versus
7     plaintiff?
8  A. Many cases don't go to trial. I don't end up having to
9     testify. So as an estimate of the cases that I've
10    actually been asked to work, it's roughly 170 plus about
11    75 percent have been defense related. There's no specific
12    reason for that. It's not uncommon for me to get a call
13    regarding a plaintiff's case and once I discuss it with
14    counsel, they hire somebody else. I am pretty free with
15    my time in terms of discussing cases with counsel when
16    they call me. Most often that has to do with taser
17    related cases. There's an awful lot of misinformation on
18    the web regarding tasers and how they work, you know, what
19    the process is, how they function, what they do. So it's
20    not uncommon for me to get a call from plaintiff's counsel
21    that has a taser case, we discuss it, I provide them with
22    information, and then they decide I'm not their guy
23    because I can't -- my testimony wouldn't be helpful to
24    their case.
25 Q. Okay. It's fair to say, sir, that you probably received

Page 23

1     calls from other plaintiffs' attorneys other than with the
2     scope being as a taser case, correct?
3  A. Oh, yeah, absolutely, that's fair to say, yes.
4  Q. Okay. And some of those phone calls, I don't know how
5     many, I don't know if you could tell me, you give them
6     your opinion and they, as you say, didn't like what you
7     had to say and they went elsewhere, correct?
8  A. Yeah, that's correct. Although, I don't know that it
9     would be fair to say I give them my opinion. At that
10    early stage, it's usually just a first, I guess, you could
11    call it an opinion. It's a first reaction to the facts
12    that they're telling me.
13 Q. Absolutely.
14 A. I also generally have a role that I've shied away from
15    plaintiff's work here in Michigan just because I knew so
16    many chiefs, I worked with the insurance programs, I
17    didn't want to setup a conflict situation or the law firm
18    on the other side might be representing, you know, the
19    defense and I worked with them before on cases. So I tend
20    to shy away from plaintiff's work in Michigan, but other
21    than that, it's just, you know, we discuss the case and
22    usually what happens if I -- if I decline a case or if
23    they indicate that I'm not going to be their guy, they'll
24    ask me for a recommendation for another expert and if I
25    know someone that I think might be able to help them, I'll

Page 24

1     refer them.
2  Q. Sure. And given that, I just want to make sure it's an
3     accurate representation or percentage, you said over the
4     170 cases you've done since 1994, 75 percent of those
5     cases have been defense cases, correct?
6  A. Of the 170 plus cases, I've been consulted on since 1994,
7     estimate is roughly 75 percent would be defense cases.
8  Q. Okay. And, I guess, as a lawyer, I'm trained to hang on
9     every word. I don't want to split hairs here. When you
10    say more than a 170, can you tell me at all how much more?
11    And what I mean by that would it be over 180 or when you
12    say over 170, you're shooting for maybe 172, 173?
13 A. I stopped counting. So somewhere over 170. I literally
14    'cause I'm including, you know, if I'm been consulted, but
15    didn't do a report, if I've been consulted and they asked
16    for a recommendation for a different expert, it's just
17    more common that -- it's more common that I get calls
18    regarding defense cases because most of my work comes from
19    attorneys I've worked with giving my name to some other
20    attorney. So it tends to feed on itself, I guess, would
21    be a good way to put it. But I couldn't even begin to pin
22    down. I just know it's north of 170.
23 Q. Okay. And -- okay. So you would agree with me that an
24    individual who is handcuffed behind their back cannot use
25    their hands or arms to support themselves if they fall,

Case 3:21-cv-10352-RHC-EAS   ECF No. 46-16, PageID.1295   Filed 05/11/22   Page 9 of 33

Darrin VanPelt v
Aaron Layne and City of Detroit

Steven Ashley

Steven Ashley - Vol. I
April 12, 2022

Page 25

1  correct?
2      MR. PADDISON: Objection to form.
3  A. I would agree that that would be a typical situation
4     absent some unusual capability that a person has twisting
5     sideways and falling on their elbow or something, but
6     generally, if they they're handcuffed behind their back,
7     they're not going to be able to bring their hands forward
8     to break their fall.
9  Q. (BY MS. DeROUIN): Okay. And in general when you say
10    absence of a exigent circumstances or whatever you were
11    saying if they were to fall on their side and they would
12    still possibly more than likely could sustain an injury
13    because, of course, they would be hitting their elbow just
14    like you gave me an example, correct?
15 A. I don't know that they would be injured. A lot of people
16    fall and aren't injured.
17 Q. Okay.
18 A. So yeah, the simple fact that they're handcuffed behind
19    their back doesn't mean that they can't somehow control
20    part of their fall, you know, depends on how they twist
21    their body or how agile they are or, you know, any of a
22    dozen other variables that could come into play.
23 Q. Okay. But certainly if their hands were free and their
24    arms were free, they would be more apt or definitely able
25    to use those hands or arms to catch themselves if they

Page 26

1  were able to fall, correct, whether sustaining an injury
2  or not?
3  A. I would say many times they probably would be able to
4     somehow break their fall by using their arms or their
5     hands.
6  Q. Okay. So essentially, would you say that the handcuffs
7     immobilize the handcuffed individual's arms and hands,
8     correct?
9  A. If they're properly handcuffed, they -- the whole point of
10    being handcuffed -- pardon me. The whole point of being
11    handcuffed is to immobilize the hands so if they're
12    properly handcuffed, to a certain degree, their hands are
13    immobilized, that's the whole point.
14 Q. Sure. And once a police officer ceases an individual,
15    they properly handcuff them behind their back, that
16    officer has a duty or responsibility to protect that
17    individual because he or she took away their inability to
18    use their arms and hands, correct?
19 A. I would say that when a person is ceased and in custody,
20    the officer has a responsibility for that person's safety
21    absent some extenuating circumstance.
22 Q. Okay. Can you give me any examples of any extenuating
23    circumstances?
24 A. Well, there may be cases where officers have been
25    assaulted by people that were handcuffed. Some

Page 27

1  individuals that are particularly agile can quickly move
2  the cuffs around in front of their body. Officers can be
3  or individuals can be assaulted by somebody kicking or
4  head-butting. Somebody running away is resisting. So in
5  simple fact that someone is handcuffed doesn't mean that
6  they're fully controlled or prevented from taking some
7  action.
8  Q. Okay. But overall, I'm just asking, with regard to Stacy,
9     generally speaking, and absent any type of special
10    circumstance that you name me, when an officer ceases an
11    individual, puts them into custody, they do a proper
12    handcuffed behind their back, at that point, they have
13    that responsibility to protect that individual because
14    they no longer can use their arms and hands, the arrestee,
15    correct?
16 A. Well, I think they have a general responsibility for the
17    person's safety.
18 Q. Sure. Because --
19 A. Whether --
20 Q. Go ahead.
21 A. Whether it's because they handcuffed them behind their
22    back or whether it's just they're in custody, pardon me.
23 Q. Well, if they handcuff them behind their back, you would
24    agree with me that they -- say the officer took away the
25    arrestee or that individual's opportunity to protect

Page 28

1  themselves such as from a fall because they can no longer
2  use their arms and their hands, correct?
3  A. I don't really disagree. I'm concerned about putting too
4     much of a straight jacket on my statement. I guess, my
5     statement stands that an officer -- once someone is ceased
6     and in the officer's custody, the officer has a
7     responsibility for the person's safety, whether it's
8     because they've handcuffed them or whether it's because
9     they're just in their custody or whether it's because of
10    where they placed them.
11 Q. Okay. In general, let me ask you this. If an officer
12    places an individual who is super drunk in their custody
13    and control, they cease them, they've arrested them,
14    they've properly handcuffed them behind their back and if
15    they are escorting that individual down from a sally port
16    down to the booking station and they notice that
17    individual having trouble walking, stumbling, they may
18    fall, does that officer have a responsibility to that
19    person's safety to ensure they don't fall because given
20    that they cannot protect themselves from falling because
21    their arms and their hands are handcuffed behind their
22    back?
23 A. I think we're saying the same thing. In your particular
24    hypothetical, an officer, I would say, has a
25    responsibility to do whatever they can do reasonably to

Page 29

1 prevent the person from falling, whether they're
2 handcuffed behind their back or not.
3 Q. Okay. If you wouldn't mind, sir, if you could look to
4   page 48 of your report. It's under your opinions.
5 A. Okay.
6 Q. Okay. Sir, and I see your opinions are identified as,
7   excuse me, paragraph one, two, three, and four under the
8   Section No. 19 opinions. Do you see that?
9 A. Yes.
10 Q. Do you have any other opinions related to this case other
11   than those found on page 48 that's under the opinion
12   section?
13 A. These are the general, I guess, what you would consider
14   capstone opinions. There are various statements
15   throughout the report that take on the tone of that
16   opinion in various elements. So these are the primary
17   opinions that result from the whole analysis, but I'm sure
18   elsewhere in the report, there are statements that
19   essentially are opinions perhaps some sub element.
20 Q. Okay. So how I understand it under Section 19 opinions,
21   you have four opinions, those are your general opinions in
22   this case, correct?
23 A. That's correct.
24 Q. And, of course, others in the prior previous 47 pages of
25   your report approximately, you note things as far as in

Page 30

1 the in instant case and italicized and you kind of give
2   some statements about your line of thinking analysis,
3   correct?
4 A. That's correct, yes.
5 Q. Sure. And I would assume those statements within the
6   prior 48 pages of your report is what you're saying
7   support your general opinions found on page 48, correct?
8 A. Yes.
9 Q. Okay. And I just want to make sure, other than what's in
10   your report, the 48 pages prior to page 48, excuse me, and
11   then also the main four opinions found on page 48, do you
12   have any other opinions on this case at all?
13 A. I'm not sure how fine a point you're trying to put on
14   that, Counselor. There are statements in my report
15   regarding -- one example comes to mind is Mr. Katsaris'
16   statements about officers are all trained not to tackle
17   people that are handcuffed, officers are all trained to
18   grab somebody by the handcuffs. There are -- I have
19   statements in here essentially saying that's not true. So
20   if you're trying to put that fine point on it, then yes,
21   there are other statements throughout the report that
22   reflect facets of my opinion, but collectively when all
23   that is considered, you know, these are the general
24   opinions.
25 Q. Sure. And I understand it and that's why in fairness to

Page 31

1 you, I did reference the 48 prior pages. Those statements
2   are opinions, your general opinions are listed on page 48.
3   I guess, all I'm asking you, sir, and I know you said you
4   believe you read the dep transcript of Katsaris and I know
5   you read his report because, of course, you rebutted his
6   report, so to speak, in your report, correct?
7 A. That's correct, yes.
8 Q. And I'm just asking, sir, as you sit here today, driving
9   -- well, you probably didn't drive anywhere, but maybe you
10   did. But just thinking before you gave testimony hey,
11   there might be something else I don't agree with with Mr.
12   Katsaris or I may have read something differently in a dep
13   and I have a different opinion on this, that's all I'm
14   asking. I'm asking for any opinions besides the opinions,
15   if you want to call it statements in your report, do you
16   have any additional opinions to offer us today?
17 A. Nothing that I can think of, no.
18 Q. Okay. And why I ask that I'm not -- I'm definitely not
19   here to trick you into saying ah-ha, I found something.
20   I'm just going to ask you questions about those opinions.
21   So right now I'm prepared to go forward with the opinions
22   that are in your report, okay?
23 A. I understand, yes.
24 Q. Okay. Okay. This case does not involve a deadly force
25   encounter, right?

Page 32

1 A. That's true, yes.
2 Q. Okay. And it looks to me that Mr. VanPelt the evidence
3   supports he was initially stopped for a traffic stop for
4   tinted window, do you agree with that?
5 A. That's my understanding, yes.
6 Q. Okay. And then the traffic stop then led to the crime
7   involving narcotics possession, correct?
8 A. That's my understanding and there were a number of traffic
9   warrants, also he didn't have a driver's license, I
10   believe, those were all things that Officer Layne listed.
11 Q. Okay. Anything else you recall? We have narcotics
12   possession, traffic warrants, and no driver's license and
13   tinted windows.
14 A. When they ran the plate, it came back on a different
15   vehicle. So there was some question about, you know,
16   ownership of the vehicle whether it was possibly a stolen
17   vehicle or not.
18 Q. Okay. Anything else that you can recall, sir?
19 A. Not offhand.
20 Q. Okay. So we have traffic citations, we have narcotics
21   possession, and traffic warrants. Would any of those, in
22   your opinion, be a violent crime or crimes?
23 A. Well, they're crimes. I don't think you would consider
24   them violent crimes.
25 Q. Correct. And a narcotic possession certainly wouldn't be

Case 3:21-cv-10352-RHC-EAS  ECF No. 46-16, PageID.1297  Filed 05/11/22  Page 11 of 33

Darrin VanPelt v
Aaron Layne and City of Detroit

Steven Ashley

Steven Ashley - Vol. I
April 12, 2022

Page 33

1 deemed as a violent crime, correct?
2 A. Generically speaking, I wouldn't consider it a violent
3 crime if it was a sufficient quantity to indicate intent
4 to deliver, you know, that would indicate that you're
5 dealing with a drug dealer. So depending on how you want
6 to extrapolate that out to your concept of a violent
7 crime, but if I understand your question, you're asking
8 about things that would present an immediate threat, you
9 know, during the arrest and I wouldn't consider it at that
10 point to be a violent crime.
11 Q. Sure. Related to this case, correct, based on what you
12 told me about he was pulled over, Mr. VanPelt was pulled
13 over for tinted window, he did have traffic warrants, he
14 didn't have a driver's license to present, there was an
15 issue with the plate being on a different vehicle, and
16 then a narcotics were found on him. Based on those
17 findings and those alleged crimes and Mr. VanPelt
18 committed, you would agree with me that those were not
19 violent at the time, correct?
20 A. That's true, yes.
21 Q. Okay. Also too, I know you reviewed the evidence and I
22 saw the list of evidence you reviewed in this case and in
23 the back of your report. You seen that Mr. VanPelt was
24 patted down twice prior to this incident, correct, and the
25 incident being we'll just call it the running incident and

Page 34

1 the tackle, okay, that's what I'm talking about?
2 A. I know there was a cursory pat down during the arrest
3 process.
4 Q. Okay. And you saw that on the video, correct?
5 A. Yes.
6 Q. Okay. And that's the pat down you're referring to?
7 A. Yes.
8 Q. And then you call that a cursory pat down?
9 A. Yes.
10 Q. Are you making a distinction between a cursory pat down
11 and a pat down or are we talking about the same kind of
12 pat down?
13 A. We're talking about a typical side of the road quick pat
14 down for weapons, but we're not talking about a really
15 thorough search where something else could be concealed.
16 Q. Okay. A search incident to an arrest, would a cursory pat
17 down be performed or a thorough pat down, as you say,
18 would be performed?
19 A. Well, in my experience, an awful lot of roadside arrest
20 related pat downs are not thorough enough. They tend to
21 be kind of quickly done and there's -- that's the --
22 that's my perception of what was done here. You know, a
23 thorough search would involve places on the body where
24 things could be hidden that, you know, wouldn't
25 necessarily present as big bulges in the waistband sort of

Page 35

1 thing. So unfortunately, a lot of officers don't do as
2 thorough a pat down as they should when they're making an
3 arrest.
4 Q. So -- okay.
5 A. And that's what I meant by a cursory pat down.
6 Q. Okay. You saw where Defendant Layne patted Mr. VanPelt's
7 legs and it was the outside and then the inside up to his
8 crotch area and then around his waist and then he did his
9 upper body, right?
10 A. I don't recall specifically all the details of it, but it
11 was -- it was a roadside pat down.
12 Q. And it sounds to me that you're taking issue with how
13 Defendant Layne patted Mr. VanPelt down in the first
14 place, is that true?
15 A. I'm saying generally that officers have a tenancy to
16 sometimes do those kinds of quick pat downs by the
17 roadside. If there's an indication that the person is
18 hostile and resistant, then the search incident to arrest
19 may be a little more thorough. If there's an indication
20 that the person is docile and compliant, then there tends
21 to be a, you know, a quicker pat down.
22 Q. Okay. With regard to this video and the pat down, you
23 were able to see Mr. VanPelt and Defendant Layne, correct?
24 A. Yes.
25 Q. And you were able to see Defendant Layne through the pat

Page 36

1 down as you just told me about, correct?
2 A. Yes.
3 Q. And in that video viewing when the pat down was taking
4 place by Defendant Layne upon Mr. VanPelt, did Mr. VanPelt
5 make any reaction to you that would give you a -- give you
6 an opinion or lead you to believe that Defendant Layne had
7 to not do such a thorough pat down based on how Mr.
8 VanPelt was acting?
9 A. I'm not clear on your question. Can you restate that for
10 me please? Are you still there? (ZOOM DIFFICULTIES).
11       (Off the record at 10:49 a.m.)
12       (Back on the record at 10:52 a.m.)
13       (Record read back at 10:5 a.m.)
14       THE REPORTER: And in that video viewing when the
15 pat down was taking place by Defendant Layne upon Mr.
16 VanPelt, did Mr. VanPelt make any reaction to you that
17 would give you a -- give you an opinion or lead you to
18 believe that Defendant Layne had to not do such a thorough
19 pat down based on how Mr. VanPelt was acting?
20 Q. (BY MS. DeROUIN): And I guess I would make one change.
21 That he couldn't do, Defendant Layne couldn't do a
22 complete or thorough pat down based on how Mr. VanPelt was
23 reacting from what you saw?
24 A. From what I saw, I didn't see anything on the part of Mr.
25 VanPelt that would indicate that he was -- at that point

Case 3:21-cv-10352-RHC-EAS ECF No. 46-16, PageID.1298 Filed 05/11/22 Page 12 of 33

Darrin VanPelt v
Aaron Layne and City of Detroit

Steven Ashley

Steven Ashley – Vol. I
April 12, 2022

Page 37

1 that he was resistant or non-compliant and so I didn't see
2 anything there that would, in my opinion, would indicate
3 Officer Layne that he either couldn't do a thorough pat
4 down or that he needed to do a more thorough pat down
5 based on VanPelt's actions. VanPelt seemed cooperative
6 and compliant right up to the point where he broke away
7 and ran.
8 Q. Okay. In general in your years of experience and
9 training, and I know you were an officer, I believe, for
10 15 years, if I'm short cutting that, I'm sorry, I thought
11 I read that somewhere, are officers -- law enforcement
12 officers trained when they make a search incident to an
13 arrest at a traffic stop, are they trained to do a cursory
14 pat down before allowing the individual in the car, the
15 arrestee in the car, or are they trained to do a thorough
16 pat down for weapons before they put the individual in the
17 car?
18 A. Well, they're trained do it -- it's a generic term you're
19 using, but, I guess, I would say everybody that I trained
20 to do it, I train them to do a thorough pat down. That
21 doesn't mean that years later based on their experience
22 and their assessment of a particular situation, they won't
23 shortcut the process or, you know, do less of a thorough
24 pat down than they would if they were in my class and I
25 was grading them on the pat down.

Page 38

1 Q. Okay. And based on what I just understand your opinion
2 that you believe Defendant Layne in this pat down
3 situation on his own accord, took a shortcut or with
4 regard to doing a thorough pat down?
5 A. No, I'm not saying that. I'm not saying he didn't do a
6 thorough pat down.
7 Q. Okay.
8 A. What I'm saying is that when a suspect is compliant and
9 apparently cooperative and docile, that it's not uncommon
10 for officers, especially experienced officers during the
11 daytime to, you know, on a bright, sunny day on a
12 residential street where nothing looks threatening to do a
13 quick pat down, put the cuffs on, you know, take them away
14 kind of situation. I guess, the only point I'm trying to
15 make is that doesn't mean that it wasn't -- it doesn't
16 mean that there was not the possibility of something else
17 being concealed on Mr. VanPelt even though he was patted
18 down and we saw that after the takedown when another bag
19 of drugs was found that wasn't discovered during the
20 initial pat down.
21 Q. Yeah, we'll definitely get to that, but I mean, given the
22 set of circumstances in this case instead of any -- and I
23 don't want to go into any hypotheticals I'm sure you've
24 seen in your years of law enforcement training for expert
25 review. Given the situation the totality of the

Page 39

1 circumstances in this case, you would agree with me, just
2 as you told me, Mr. VanPelt was compliant, he was
3 non-resistant, he was not trying to evade or anything
4 along those lines at the time that he was being patted
5 down by Defendant Layne, correct?
6 A. I agree with that, yes.
7 Q. Okay. And at that time, Defendant Layne then had the
8 opportunity to do a thorough and complete pat down if he
9 so choosed, correct?
10 A. Yes.
11 Q. Because during that pat down as well, we'll add one more
12 thing to it, Mr. VanPelt was handcuffed, correct?
13 A. I'm not sure if the pat down started before the
14 handcuffing, but he was handcuffed during the pat down,
15 yes.
16 Q. Sure. Okay. So given those circumstances, the totality
17 of circumstances based on Defendant Layne and Mr. VanPelt
18 in that moment of the pat down, is it your opinion that
19 that pat down was thorough and complete?
20 A. Well, it's my opinion that Officer Layne probably felt it
21 was thorough and complete, but then once the takedown
22 occurred, there was other evidence that was found that
23 wasn't found during the pat down.
24 Q. Okay.
25 A. So that, you know, I'm not sure how else to say that.

Page 40

1 Q. Okay. During Defendant Layne's pat down, the pat down we
2 were just talking about, were any weapons found on Mr.
3 VanPelt's person?
4 A. I don't think there were any weapons. I don't recall
5 anything.
6 Q. Okay. And there were no weapons found on Mr. VanPelt's
7 car as well, correct?
8 A. I don't recall that, but I don't believe there were.
9 Q. Okay. No one testified to finding any weapons, whether
10 that be Officer Bennett or Defendant Layne finding any
11 weapons in Mr. VanPelt's car, did you see that at all?
12 A. I don't recall anybody testifying of finding weapons in
13 the car.
14 Q. Okay. So let's just say -- let's just say is it safe to
15 assume if Mr. VanPelt did not run, he did not leave where
16 he was supposed to be, after Defendant Layne's pat down of
17 Mr. VanPelt, if Mr. -- yes, if Defendant Layne's pat down
18 of Mr. VanPelt, if Mr. VanPelt did not run, it would be
19 safe to assume Defendant Layne would have put Mr. VanPelt
20 in the back of his police car, correct?
21 A. He was going to put him in the car. I'm assuming he was
22 going to put him in the back, yes.
23 Q. Okay. And what I mean by that, sir, and nothing -- yeah,
24 go ahead. Get some water.
25 A. Go ahead.

Page 41

1  Q. Nothing in your training, years of experience, teaching,
2     being a law enforcement officer would formulate an opinion
3     that if Mr. VanPelt did not run before Defendant Layne
4     placed him in his police cruiser, that he had to do
5     another pat down, correct?
6  A. I'm not clear on your question. I'm sorry.
7  Q. Sure. I can reword it. We just talked at length Mr. --
8     Defendant Layne's pat down of Mr. VanPelt, correct?
9  A. Yes.
10 Q. And I'm just giving you a hypothetical. Let's say Mr.
11    VanPelt did not run and the next step would be for
12    Defendant Layne to put Mr. VanPelt in his police cruiser,
13    whether that be in the front or the back, correct?
14 A. Yes.
15 Q. That would be the next step I'm trying to say?
16 A. Yes.
17 Q. Would there be any reason in that scenario for Defendant
18    Layne to do a second or third pat down of Mr. VanPelt
19    before he put him in his squad car that you could tell me?
20 A. He might have wanted to, but I can't think of any reason
21    where I would say he should have.
22 Q. Okay. Okay. Going to page 33 of your report, sir.
23 A. All right.
24 Q. And it's under the in the instant case, I know you talked
25    about statements earlier that may derive your opinions. I

Page 42

1     want to look at this on page 33, which starts off and
2     italicized in the instant case. I'm just going to --
3     although he had been patted down, Layne could not be
4     certain if VanPelt was armed or may have additional
5     contraband or a weapon secreted elsewhere on his body,
6     period, end quote. Do you see that?
7  A. Yes.
8  Q. Are you referring to any kind of weapon that you could
9     tell me about in that -- when you make that statement?
10 A. No, just a weapon in general.
11 Q. Okay. You can't make a distinction you're referring to a
12    knife or a gun or anything along those lines or similar?
13 A. No.
14 Q. Did you see any evidence in this case when Mr. VanPelt was
15    attempting to runaway or when he was running away from
16    Defendant Layne while he was handcuffed behind his back if
17    he was trying to reach at all in his pants at all?
18 A. I don't recall seeing anything like that, no.
19 Q. Okay. And if you had, you would of put that in your
20    report, correct?
21 A. I'm sure I would have.
22 Q. Okay. 'Cause if some -- I mean, it could be in your years
23    of experience and as a law enforcement officer and a
24    trainer and instructor, teacher at a university that if,
25    you know, an officer were to see someone reaching in their

Page 43

1     pants even being handcuffed, they could possibly be
2     reaching for a weapon, correct?
3  A. They could possibly be reaching for a weapon if an officer
4     saw that, yes.
5  Q. Okay. So other than, I guess, let me ask it this way.
6     With regard to that when you say Layne could not be
7     certain if VanPelt was armed or may have additional
8     contraband or a weapon secreted elsewhere on his body, we
9     already talked about the pat down, we already talked
10    about, I guess, the two pat downs. What evidence, if any,
11    that you could see, when you reviewed this case, that
12    would formulate a belief in Layne that he could not be
13    certain if VanPelt was still armed?
14 A. I don't know that there wasn't -- was anything that would
15    indicate that.
16 Q. Okay. And then we talked briefly you told me after the
17    incident already happened, Mr. VanPelt's on the ground,
18    and his pants were pulled down and Defendant Layne found
19    more narcotics, I think, in between his buttock for lack
20    of a better word, that's what you were referring to,
21    correct?
22 A. Well, I don't know that Layne actually pulled the pants
23    down. They were -- you know, his clothing was moved, the
24    bag fell out. I know there was an allegation that he put
25    his hand in between Mr. VanPelt's buttock and, but I don't

Page 44

1     believe the video showed that.
2  Q. Okay. I guess, all I'll trying to say, sir, is there was
3     no weapons found on Mr. VanPelt after the extra bag of
4     narcotics was found, correct?
5  A. As far as I know, there wasn't, no.
6  Q. Okay. And, of course, if there had been, you would of
7     probably noted that in your report, right?
8  A. If it was in the documentation for the case, I would of
9     noted it, yes.
10 Q. Okay. I take it, and I just want to ask, I have to ask
11    for the sake of foundation purposes, are you familiar with
12    PPCT training?
13 A. Yes.
14 Q. Okay. And that would stand for pressure point control
15    tactics training?
16 A. Yes.
17 Q. Okay. Am I correct that there's nothing in the PPCT
18    training that allows for an officer to tackle from behind
19    with both of the officers' feet leaving the ground while
20    the individual has been patted down and handcuffed running
21    and has committed a non-violent crime?
22 A. I'm not -- I don't recall anything in the PPCT training
23    that speaks to that one way or the other.
24 Q. Okay. So there's nothing that you would have in your
25    possession with regard to PPCT training that would support

Page 45

1    what I just asked you, correct?
2  A. Well, there's nothing that I would have in my possession
3     that would also negate that either.
4  Q. Okay. With regard to PPCT training, that's a training
5     guideline for officers, correct?
6  A. That's actually a training program.
7  Q. Sure.
8  A. A defensive tactics training program encompasses a lot of
9     different aspects of resistance and control.
10 Q. For law enforcement officers, correct?
11 A. For corrections officers, for private security, depending
12    on the --
13 Q. Sure. And it would certainly include law enforcement,
14    police officers, patrol officers, right?
15 A. If the officers were trained on PPCT. Not every
16    department uses PPCT.
17 Q. Okay. But you're familiar with PPCT training probably in
18    all your years as a, you know, as a career police officer
19    and all your work done as well as expert work, correct?
20 A. I'm generally familiar with PPCT training, yes.
21 Q. Okay. And you don't recall reading anything or being
22    taught anything that allows for this type of takedown in
23    the circumstances I just read to you, correct?
24 A. As I just testified, I'm not -- I don't recall anything
25    that allows for it and I also don't recall anything that

Page 46

1     is preventative of it.
2  Q. Are you aware of any -- okay. So you're saying you don't
3     recall anything that allows for it or prevents it?
4  A. That's correct.
5  Q. Within the pressure point control tactics training
6     program, are there specific, I guess, procedures, tactics
7     procedures, that are stated like shown to the officers
8     whether they have to read those or they're exhibited by
9     demonstration that they say these are tactics you cannot
10    do?
11 A. The only thing that comes immediately to mind would be
12    things related to choke holds and things like that. And
13    typically when those are presented to officers to cast in
14    the form of these are things you shouldn't do unless it's
15    a deadly force situation.
16 Q. Sure.
17 A. But in terms of techniques that officers are taught,
18    generally, and not just in PPCT, but in other systems as
19    well, techniques are taught as these are proactive things
20    you can do when a person resists, these are things you can
21    do when a person tries to strike you, when a person tries
22    to choke you, when a person tries to knock you down.
23    These are things that you can do as a technique to counter
24    those kinds of things. There are also types of techniques
25    and tactics that are taught as a way to move someone if

Page 47

1     they don't want to be moved to make them want to move, for
2     example, come-along holds and things like that.
3     Generally, in the system -- generally, in systems officers
4     are not presented with a list of things to not do
5     generally.
6  Q. Okay.
7  A. It's generally not the case that it's presented in that
8     form.
9  Q. Okay. But you would agree with me that an officer who
10    attends a PPCT training program would learn or is expected
11    to learn proper ways of approaching situations you just
12    told me about, what the arrestee is doing and how the
13    officer can react, correct?
14 A. That's -- I would say that's generally a fair statement
15    keeping in mind that the focus is not on what not to do,
16    the focus is on what to do.
17 Q. Sure.
18 A. And all of that. Let me just make sure that I underscore
19    that. All of that is cast in terms of how much time you
20    have to do it, how much reaction time there are, and
21    certain things take a lot longer to do. This whole --
22    this whole flight incident took something like four
23    seconds, so --
24 Q. Yep, and I understand. We'll definitely get to that in a
25    second, but all I'm asking with regard to PPCT training

Page 48

1     program in general, that is a training program that
2     teaches officers or you would expect to have officers
3     learn on how to properly approach situations, whether that
4     be by on how the arrestee reacts, correct, and what
5     technique, I'm just generally speaking, what technique or
6     -- yeah, what technique or maneuver that officer could
7     respond to based on how the arrestee is acting, correct,
8     is teaching an officer what to do in a certain
9     circumstance, correct?
10 A. Yes. To a certain degree, but also, you know, it's an
11    infinite number of situations that can evolve. So it's
12    not nearly as -- it's not cast in concrete as much as you
13    seem to be saying with your question. It's -- they're
14    very dynamic fluid interactions. So not every possible
15    methodology or tactic is covered because not every
16    possible methodology or tactic can be covered. They're
17    infinitely possible if that makes sense.
18 Q. I would take it the PPCT training program does teach on
19    officer takedowns, correct?
20 A. There are various takedowns that are presented in PPCT as
21    well other programs.
22 Q. Okay. And a takedown can also be another word for tackle,
23    correct?
24 A. Takedown, I guess. More typically takedowns that are
25    taught are things like arm-bar, joint lock, leverage sorts

Darrin VanPelt v
Aaron Layne and City of Detroit

Steven Ashley

Steven Ashley - Vol. I
April 12, 2022

Page 49

1  of things.
2 Q. Okay. Does the PPCT training at all teach as far as with
3    regard to a tackle on how an officer could tackle?
4 A. Not that --
5 Q. To your knowledge?
6 A. Not to that I mean aware of, no. I'm also not aware --
7    I'm also not aware that it addresses that you should not
8    tackle them. I don't recall that it's specifically
9    addressed.
10 Q. Okay. So a person who has their hands behind their back,
11    you would agree with me they can't run as fast as an
12    individual whose hands are free from cuffs, right?
13       MR. PADDISON: Objection, speculation, you can
14    answer.
15 A. I would say as a general rule of thumb, that's probably
16    true cast in context. You know, a young, agile individual
17    can probably still run faster than an older, less agile
18    individual that's all loaded down with equipment. So put
19    in that context, but if you were to time somebody
20    sprinting with and then without being handcuffed, probably
21    they would be faster without the handcuffs simply because
22    they can move their arms and do that, you know, pumping
23    running sort of motion.
24 Q. (BY MS. DeROUIN): Sure. And just sticking not compare
25    ages young to old or an individual young, agile person to

Page 50

1    what you said an older weighed down person, but in
2    general, as I understand your testimony correctly,
3    sticking to a young, agile individual, they -- it's my
4    understanding that that particular person, they would run
5    faster if they were not handcuffed based on how they could
6    use their arms and so forth, is that your understanding?
7 A. I would say that's generally a true statement, yeah.
8 Q. Okay. Have you ever taken a street survival course
9    offered by Caliber Press at all?
10 A. Many years ago, yes.
11 Q. Okay. When you say that in general, would that be more
12    than 10 years, 20 years, closer to when you started your
13    clear as an expert witness or can you tell me when?
14 A. I would have to say it was early '90s maybe.
15 Q. Okay. Would it have just been one course, sir, in your
16    career or is it something you may go to every couple years
17    or anything like that?
18 A. Are you talking about the Caliber Press Street Survival
19    Seminar?
20 Q. Yes, sir.
21 A. I think I only went to it once. I don't recall going to
22    it a second time.
23 Q. Okay. Do you recall at all when you went to that course
24    or conference did the lead use of force instructor who
25    taught the conference, did he talk one or the other

Page 51

1    whether it was reasonable or acceptable for an officer to
2    tackle an individual who's already been patted down,
3    handcuffed from behind by the officer lunging with his
4    feet off the ground?
5 A. I couldn't even begin to recall that level of detail. I
6    have no recollection that that was -- I've never seen that
7    taught in anything.
8 Q. And, of course, I know you're familiar with the IACP
9    training keys?
10 A. Generally, yes.
11 Q. Okay. That's those International Association Chiefs of
12    Police training keys?
13 A. Yes.
14 Q. Okay. I guess, I should ask and I don't mean to maybe
15    you're not. There's other areas that you probably are
16    well versed in, but I'm asking with regard to the IACP
17    training keys, are you well versed in those trainings
18    keys, sir?
19 A. Not without looking stuff up, no.
20 Q. Okay.
21 A. Many of the training keys are outdated and haven't been
22    updated in a long time.
23 Q. Okay. So if I --
24 A. I have --
25 Q. Go ahead. I cut you off.

Page 52

1 A. I was just going to say I have them all and, you know, if
2    I need something, I can look them up, but I don't have
3    them at the front of my memory at this point.
4 Q. Okay. So if I were to ask you whether or not the training
5    keys on use of force allow a takedown by tackling from
6    behind with both of the officer's feet leaving the ground
7    while the individual has been patted down already and
8    handcuffed, he's running and he's committed a non-violent
9    crime, would you say that you saw that in there or not in
10    the keys, if you can give me one way or the other?
11 A. I've never seen that to that level of specificity
12    anywhere. And I would be really surprised -- I guess, the
13    direct answer to your question is no. I don't remember
14    seeing that in the training keys. If somebody stuck it in
15    front of me and said there it is right there, I would say
16    okay. But in general, I would be very surprised if the
17    IACP training keys, model policies, or the white papers
18    define that as quote-on-quote something not to do,
19    especially of that level of specificity, that's just
20    generally not the way those documents are cast.
21 Q. Okay. And what I'm asking is you're saying the training
22    keys, you would be surprise the training said that's what
23    not to do. It's certainly, from your experience of those
24    training keys, it's certainly something that the training
25    keys don't teach what could be done or what would be

Case 3:21-cv-10352-RHC-EAS   ECF No. 46-16, PageID.1302   Filed 05/11/22   Page 16 of 33

Darrin VanPelt v
Aaron Layne and City of Detroit

Steven Ashley

Steven Ashley - Vol. I
April 12, 2022

Page 53

1  allowed, correct?
2  A. Right.  I don't -- I have not seen it, especially to that
3     level of specificity either way, either never do this or
4     it's okay to do this.  Just not typically addressed in
5     those kinds of documents.
6  Q. Are you familiar at all with NTOA?
7  A. I'm generally familiar with what it is.
8  Q. The National Technical Officer Association?
9  A. Yes.
10 Q. Okay.  And how are you familiar with that?
11 A. Just I'm familiar with the fact that it exists.  I've read
12    some of the materials years ago when I was engaged in the
13    initial TSA airport screener training and NTOA was
14    coordinating it.  So I interacted with some of their
15    people.  I know a lot of tactical officers that belong to
16    it, so --
17 Q. Okay.  I know you said you read some of the materials.
18    I'm just going to ask again do you know if this
19    association trains it's squad officers to tackle someone
20    from behind with their feet leaving the ground while the
21    individuals been patted down and handcuff and on the run?
22 A. I don't know whether they teach to do that or not to do
23    that.
24 Q. We already talked about your familiarity and your
25    membership with ILETTA, correct, earlier on in the

Page 54

1     deposition?
2  A. Yes.
3  Q. And it looks like you attend ILETTA conferences, as you in
4     just did, and I'm so sorry.  You just did last month,
5     right?
6  A. Yes.
7  Q. Okay.  And it looks like from your CV, you've attended
8     them in the past, in, I believe, in 1980 and so forth,
9     it's reflected in your CV, correct?
10 A. Yes, I've only missed a couple including last year when we
11    didn't have one because of COVID.
12 Q. I assume that.  So they're annual conferences, right?
13 A. Yes.
14 Q. Okay.  At any of those conferences that you sat in or the
15    programs that were taught, do any of those that you can
16    sit here and tell me, have, you know, specificity with
17    regard to tackle and takedown and allow for an officer to
18    takedown somebody while they're on the run and handcuffed
19    behind their back, they've already been searched for
20    weapons and for allowing that officer to leave the ground
21    and tackle them?
22 A. Maybe I can save you some time.  In answer to your
23    question as well as anticipating further questions, I have
24    never seen anything anywhere that drills down to that
25    level of specificity regarding a tackling either never do

Page 55

1  it or it's okay to do it, whether it be ILETTA
2  conferences, PPCT, NTOA, IACP guidelines or anything else.
3  Materials that are written for officers in the way that
4  you're talking about generally do not drill down to that
5  level of specificity on any kind of tactic.  They're
6  usually casted a more general level of specificity to
7  allow officers the flexibility to do things in the field
8  with the exception of certain things like I talked about
9  with choke holds and things that would be considered
10 deadly force.
11 Q. But you would also agree with me that no academy in the
12    country would teach that as well, correct?
13     MR. PADDISON: Objection as to form, calls for
14     speculation, you can answer.
15 A. I'm not familiar with any academy that teaches to do it or
16    that teaches not to do it and I then formally surveyed
17    dozens of trainers and coordinators and police academy
18    attorneys and other master instructors both in my personal
19    acquaintance as well at the national conference I was just
20    at, I've informally surveyed them regarding the issue of
21    tackling either it's okay to do it or you should never do
22    it and the other point that Mr. Katsaris brought up, which
23    is grabbing somebody by handcuffs and pulling back to stop
24    them.  And out of all those individuals, probably close to
25    a hundred people, no one had ever heard of either one of

Page 56

1  those things in the way that Mr. Katsaris presented it
2  saying everybody knows this.  Apparently, in my
3  experience, nobody knows that except Mr. Katsaris.
4  Q. (BY MS. DeROUIN): Okay.  With regard to the survey, back
5     that up, was it -- what type -- was it a formal survey you
6     did or just a survey you did on your own?  Like I'm saying
7     is there somewhere I can find that survey or you can
8     provide me that survey, is it published work by you?
9  A. No, as I just testified, I did an informal survey.
10 Q. Sure.
11 A. Of individuals, I started out back at the time -- before I
12    wrote my report, calling around the country various
13    individuals that I know are heavily involved and have been
14    for many years and police use of force training and
15    analysis and then while I was at this conference last week
16    in Nashville, there were 80 some trainers in the room and
17    most of them, you know, in charge of training at a given
18    police academy or whatever and informally, not for
19    attribution to any of them, I asked has anybody ever heard
20    of a training program or any kind of situation where
21    officers are trained to never tackle a running suspect
22    who's been handcuffed behind their back or instead of
23    tackling them, to grab their handcuffs and pull back on
24    them and they all had the same reaction.  And I -- you
25    know, I had never heard of it anyplace and I wanted to

Case 3:21-cv-10352-RHC-EAS ECF No. 46-16, PageID.1303 Filed 05/11/22 Page 17 of 33

Darrin VanPelt v
Aaron Layne and City of Detroit

Steven Ashley

Steven Ashley - Vol. I
April 12, 2022

Page 57

1  make sure that I was accurate in my assessment that it's
2  just not the common knowledge as Mr. Katsaris implied that
3  it is.
4       I also did a review of the State of Florida
5  department of law enforcement high liability training
6  program that they presented in the police academies in
7  Florida since at least 2011 looking for anything in
8  reference to those two points and there's nothing. The
9  reason I picked the State of Florida is because where Mr.
10  Katsaris is from, so --
11 Q. Okay. With regard to your informal survey that you've
12  done at the conference last week, that's the ILETTA
13  conference, right?
14 A. No, this was the certified use of force instructor slash
15  analyst conference that I was talking about.
16 Q. Earlier. Where was that held at?
17 A. That was in Nashville and it was just this past week. The
18  ILETTA conference was a couple weeks prior to that.
19 Q. Yeah, in March, right, roughly?
20 A. Yes.
21 Q. Okay. But when you took the survey of the individuals at
22  the conference, you're, of course, talking about the
23  certified instructor conference in Nashville?
24 A. That's correct. And again, it was an informal survey,
25  there's nothing written or published about it. I just

Page 58

1  wanted to make sure I was being accurate.
2 Q. But that's what I was going to ask you. This informal
3  survey, just as you say when you called around several
4  hundred people or a hundred people and various individuals
5  across the country as well as asking or polling people at
6  this conference last week, you didn't reduce that to
7  writing, correct?
8 A. First of all, I didn't call around to hundred people. I
9  called probably 15 or 16 people that I personally know and
10  because I did know I was going to have the opportunity to
11  survey this conference. At the conference is where there
12  were I think 84 people in the room including me and
13  because it just happened last week, there's nothing that I
14  reduced in writing regarding that. There is a note in my
15  report about the informal survey of the initial
16  individuals that I contacted.
17 Q. Okay. But given that it's not in writing, there's no way
18  for myself or Mr. Katsaris to review these individuals
19  their, you know, their careers, you know, where they're
20  coming from, how many years of experience they had or even
21  their name for us to fact check, so to speak, correct, you
22  would agree with me on that?
23 A. That's right. There is no list.
24 Q. And I can only assume too when you did the poll at the
25  conference of those approximate 84 people, you probably

Page 59

1  couldn't even tell me sitting here the 84 people's names
2  or phone numbers or anything like that where Mr. Katsaris
3  or myself could fact check that and speak to them,
4  correct?
5 A. That's true.
6 Q. And when you took that poll, was it just by a show of
7  hands, did you just ask the question by a show of hands
8  can you tell me any information on this or what could --
9  you know, how did you get this information with these 84
10  people?
11 A. Okay. As I testified, it was just an informal poll, I
12  asked the group is there anybody in here that's ever heard
13  of this, and nobody indicated that they had.
14 Q. Okay.
15 A. I said is there anybody here that's ever trained this or
16  knows anyplace where this is trained, the concept is Mr.
17  Katsaris said this is common information, everybody knows
18  this. I didn't know that and so far, I haven't found
19  anybody else, except Mr. Katsaris, that says everybody
20  knows this. So I wanted to -- again, I wasn't trying to
21  do this for attribution. I was trying to make sure that I
22  was correct that I've never heard of that and I've been
23  doing this a long time and nobody else that I have asked
24  about it has ever heard of it either.
25 Q. Are you intending, sir, to put this informal survey, the

Page 60

1  results of your survey, and your analysis on how you
2  reached those results in writing at all?
3 A. Other than what's already in my report, no.
4 Q. Okay. And you would agree with me the conference that you
5  attended last week when you polled those 84 people
6  approximately, that wouldn't be in your report from
7  December, correct?
8 A. That wouldn't be in my report in December. If I was asked
9  about it at trial, questioned about it, which are basis
10  for making this statement, then I would probably reference
11  the informal poll I took at the conference just the way
12  that I'm doing it with you.
13 Q. Right. Just what you told me, you couldn't tell a Jury
14  the names of any of these individuals, could you?
15 A. No.
16 Q. You couldn't tell a Jury any of these individuals'
17  background, career background, correct?
18 A. No.
19 Q. Okay. Is there anything that, as you sit here today, that
20  you think you could tell a Jury in order to identify these
21  individuals at all other than that they were present at
22  the same conference you were last week?
23 A. No.
24 Q. Okay. And again, with that being said not being reduced
25  in writing, you don't have any additional information to

Case 3:21-cv-10352-RHC-EAS ECF No. 46-16, PageID.1304 Filed 05/11/22 Page 18 of 33

Darrin VanPelt v
Aaron Layne and City of Detroit

Steven Ashley

Steven Ashley - Vol. I
April 12, 2022

Page 61

1 give me, that would be something that could not be fact
2 checked as I say other than we're relying on what you just
3 told us, correct?
4 A. Well, at the risk of being non-responsive, I guess, I
5 would say that I have just as much information about what
6 I think I know as Mr. Katsaris has when he says everybody
7 knows this.
8 Q. Okay. Can you tell me, sir, the best that you can, what
9 is the exact question that you asked at this conference?
10 A. Best I can remember it was, and I'm paraphrasing.
11 Q. Sure.
12 A. It would have been has anybody in here ever heard of a
13 training program where officers are trained to not tackle
14 people that are running away when they're handcuffed
15 behind their back and then the other part is has anybody
16 in here ever heard of a training program or presented a
17 training program that would be included, I guess, has
18 anybody in here ever heard of a training program that
19 teaches that the way you stop a suspect that's running
20 away when they're handcuffed behind their back is to grab
21 their handcuffs pull back and the universal response
22 -- actually, the universal response was laughter, but you
23 got to be kidding me, why would anybody teach that, that's
24 dangerous typical comments.
25          In fact, what I also know is that officers

Page 62

1 are generally, and this is part of the reaction I've had,
2 officers are generally taught to never grab the handcuffs.
3 It's a good way for the officer to get injured and that's
4 been trained in law enforcement for decades.
5 Q. Okay. So you asked the initial question if anybody was
6 aware of a training program that teaches an officer not to
7 tackle an individual while they are running away and
8 behind with their hands handcuffed behind their back,
9 correct?
10 A. Yes, and again, I'm paraphrasing, Counselor. I don't
11 remember the exact words. What I was trying to find out
12 is has anybody ever heard of a program that teaches this
13 or teaches not to do it or addresses it really in any way.
14 But the response was -- has been universal in my
15 experience.
16 Q. Did you ever ask the question to these people at the
17 conference if they ever heard of a program that allows an
18 officer to tackle someone from behind while they're
19 handcuffed and allowing their feet to leave the air,
20 meaning the officer's feet to leave the air?
21 A. I wouldn't of -- the answer to your question is no. And
22 the reason I wouldn't of asked a question with that
23 level of specificity because that's not the way police
24 training is done with all of those individual levels of
25 specificity added in. It would be more typical to say

Page 63

1 does anybody teach that the best way to bring down a
2 running subject is to tackle them, and no, I didn't ask
3 that specific question in that specific way.
4 Q. You would agree with me in order to get an informed
5 opinion, whether that be at the conference or from an
6 individual, it would be important to provide those
7 individuals with the complete totality of the
8 circumstances in order for them to offer an opinion,
9 correct?
10 A. I don't necessarily agree with that.
11 Q. Why not?
12 A. Well, first of all, I generally don't discuss details of a
13 case to that level. And secondly, I wasn't interested in
14 their assessment of the level of immediacy of the threat
15 or anything. I was just focused on, you know, person's
16 handcuffed and they start running away, what about
17 tackling them, you know, I wasn't into -- I wasn't -- I
18 wasn't driven down to the level of making sure the
19 officer's feet don't leave the ground and the other
20 caveats that you're applying to your question.
21 Q. Okay. Did you tell them whether or not the crime was
22 non-violent, if you remember?
23 A. I've already testified exactly what -- or to the extent I
24 can remember what I told them.
25 Q. Okay.

Page 64

1 A. I didn't discuss details of the case.
2 Q. Okay. That's fair. So based on what you told me, they
3 offered their informal opinion, correct?
4 A. That would be a fair statement. It wasn't so much that I
5 told them. It's more I asked the question has anybody
6 ever heard of this.
7 Q. Okay.
8 A. And again, it was in the -- it was cast in the tone of,
9 you know, there's somebody else out here that's saying
10 everybody knows this, does everybody know this and the
11 response generally was you got to be kidding me.
12 Q. You mentioned that one of the issues you take with Mr.
13 Katsaris saying an alternative use of force method would
14 be stopping the individual by the handcuffs. I think you
15 said that it's because an injury may result to the
16 officer. Do you recall that?
17 A. That's not quite what I said.
18 Q. Go ahead then, nope, I don't want to do it that way. I
19 was just trying to speed this up, but that's okay. What
20 -- I'll just ask it this way, sir.
21          Please provide me each and every reason why
22 you take issue with Defendant Layne should not of grabbed
23 the handcuffed Mr. VanPelt as opposed to tackle him on the
24 ground.
25 A. Okay. Well, I said is that generally, officers have been

Case 3:21-cv-10352-RHC-EAS   ECF No. 46-16, PageID.1305   Filed 05/11/22   Page 19 of 33

Darrin VanPelt v
Aaron Layne and City of Detroit

Steven Ashley

Steven Ashley - Vol. I
April 12, 2022

**Page 65**

1  trained over the decades to not grab somebody by the
2  handcuffs because there's a potential for officers to be
3  injured, you know, having fingers mangled or broken by the
4  twisting of the handcuffs. So officers are just trained
5  not to grab somebody by the handcuffs and then secondly,
6  the idea of stopping a sprinting individual by grabbing
7  the handcuffs and pulling back has a significant potential
8  to injure the person that's running, dislocating the
9  shoulders, you know, a person with running momentum
10  grabbing the handcuffs and pulling backwards pulls their
11  arms up backwards and up the in air just has a significant
12  potential to cause injury to the individual and that's
13  also part of the responses I got during my informal survey
14  is wow, you would never do that, you would tear people's
15  shoulder joints and, you know, those kinds of statements
16  in response.
17 Q. What if the individual was not running too fast and the
18  officer deemed that he was kind of running slow, would
19  that change your opinion about grabbing the handcuffs?
20 A. I would say grabbing the handcuffs, especially grabbing
21  the handcuffs and pulling back to stop the forward motion,
22  I don't know that it matters how fast a person's moving.
23  If they're moving forward and you grab the handcuffs and
24  pull backwards, there's a potential for injury,
25  significant potential for injury.

**Page 66**

1 Q. Are you talking about, just so the record's clear, officer
2  injury, correct?
3 A. No, I'm talking about injury to the suspect's shoulders.
4 Q. Okay.
5 A. Shoulder holds by grabbing the handcuffs and pulling the
6  arms back and that's kind of what happened to Senator
7  McCain when he was a prisoner in the North Vietnamese.
8 Q. You would agree with me that, we already talked about
9  this, when you tackle, if an officer were to tackle an
10  individual with their arms already handcuffed behind their
11  back, there's also potential of injury for the suspect,
12  correct?
13 A. Well, there's always a potential for injury, yes.
14 Q. Okay. Any other reason, sir, why you don't agree with Mr.
15  Katsaris saying alterative use of force method or would be
16  to stop them by the handcuffs than what you've told me
17  about?
18 A. Beyond the fact that doing it that way could create a
19  significant risk of injury to the person and the officers
20  are trained, generally trained, to specifically not grab
21  the handcuffs of an individual.
22 Q. Can you point me --
23 A. Off the top of --
24 Q. Nope, go ahead. Sorry.
25 A. Off the top of my head, I can't think of another reason.

**Page 67**

1  Those seem to be two pretty good reasons for not doing it.
2 Q. Okay. Can you point me to any manuals, whether they be in
3  any of the organizations we already talked about or anyone
4  that I have not mentioned, that state or address or
5  prevent an officer from grabbing handcuffs while a suspect
6  is fleeing?
7 A. No, I can't.
8 Q. You also mentioned, sir, your review of state of Florida.
9  We talked about that. You told me what you did. All I'm
10  asking is did you reduce that to writing at all?
11 A. I have not. That was all after my report was submitted.
12 Q. So, again, the same kinds of question I have given that
13  it's not in writing, do you intend to put it or reduce it
14  into writing to provide to me or Mr. Katsaris?
15 A. I could. If I was asked to do that, I could do that,
16  yeah.
17 Q. And, I guess, in general since I don't have it and I don't
18  know what's being asked since I'm not the one that hired
19  you, all I'm asking, sir, is, okay, can you tell me, since
20  I'm kind of at a disadvantage here, sir, there's nothing
21  reduced in writing other than I'm asking you questions
22  today, which is my one time to talk to before trial, if
23  you were to put it in writing, what would I see or what
24  would I find in that of importance?
25 A. I would probably restate my explanation of my informal

**Page 68**

1  survey adding in the informal survey I took at the
2  training conference to support my original statement and
3  then I would probably spell out the specific manuals that
4  I reviewed from the state of Florida and the fact that
5  none of them mentioned this everybody knows the --
6  quote-on-quote everybody knows this stuff.
7 Q. Sorry. About the tackle or about the handcuffing?
8 A. Both.
9 Q. Okay. Go ahead. I didn't mean to interrupt you. I just
10  wanted to make sure.
11 A. Right. And I would probably spell out in my affidavit or
12  supplemental, whatever you want to call it, that this is
13  additional support for my opinion and here's some
14  additional things I've looked at since my report, which,
15  you know, further supports my opinion, doesn't change my
16  opinion, just further supports it and I would list the
17  particular -- many of which are available online by the
18  way.
19 Q. Can you provide me today, sir, any manuals you looked at
20  that you would put in this report, any titles of any of
21  them?
22 A. I can tell you that the organization in Florida that
23  oversees law enforcement training at the state level is
24  FDLE, or the Florida Department of Law Enforcement, and
25  they publish every year a set of manuals, which are the

Page 69

1   textbooks for the police academies in the state and Volume
2   II of that set is called high liability and it addresses
3   the defensive tactics, use of firearms, pursuant driving,
4   all of those typical topics and I've reviewed all of those
5   manuals since 2011 except, I think, 2017 or perhaps 2018,
6   some are no longer available.  You sort of have to find
7   them used if you will.  But I've reviewed almost all of
8   manuals, including for 2020 and 2021, and none of them
9   speak to these issues that he says supposedly everybody
10  knows about.  So some of those you can find with a simple
11  Google search, others I already had in my library.
12  Q. Okay.  And it would be the same thing though this
13     publication or later that you may be reduced to writing if
14     you were asked by defense counsel to do so, the review of
15     the State of Florida that you did, again, with regard to
16     who you spoke with and all that, again, you wouldn't have
17     any contact information for me, correct?
18  A. On my survey?
19  Q. Yes.
20  A. No, that was all specifically done without attribution.
21  Q. Okay.  And then -- okay.  Let me just make sure I'm clear.
22     Is there anything else you would of done or have done,
23     excuse me, not would of, have done similar to an informal
24     survey, your review of the State of Florida that you
25     haven't told me about in order to, as you say, support

Page 70

1   your opinions with regard to the tackle and not stopping
2   the individual, or Mr. VanPelt, by the handcuffs?
3  A. I've done various other searching looking through
4     materials that I have and looking for different things
5     online, nothing comes immediately to mind, but --
6  Q. Okay.
7  A. I've done more poking at the question other than the
8     couple things we've talked about, I haven't come across
9     anything.  I haven't specifically looked through the IACP
10    training keys, but if I was supplementing, I would
11    probably do that since you asked me about it.
12  Q. Is there anything that you've seen on Google or any other
13     manual that you're telling about that you reviewed after
14     the fact that would support that Defendant Layne could not
15     use force by putting his hands on Mr. VanPelt's handcuffs
16     as opposed to the takedown?
17  A. Could you restate that?  I wasn't --
18  Q. Yeah.
19  A. -- quite sure.
20  Q. Sure.  Is there anything that you read that you're telling
21     me, you said Google searches, there are manuals and other
22     things, that you've read online that would support that
23     Defendant Layne could not stop Mr. VanPelt by grabbing the
24     handcuffs?
25  A. Could not or should not or --

Page 71

1  Q. Could not, that he was prevented in doing it that way or
2     should not, both of them?
3  A. Well, first of all, the short answer is no, I haven't seen
4     anything else that says -- I haven't seen anything that
5     says don't do that.  Of course, even if there was
6     something that said he shouldn't do it, he could.  That's
7     why I asked you whether you were talking about could or
8     should.  He certainly could do it even if he shouldn't
9     have.  But I haven't seen anything cast in the form of
10    don't ever do this, don't ever tackle a running subject
11    that's handcuffed behind their back.
12            The only possibly thing that would be
13    related to that, and I mentioned this in my report, is
14    some of the advisory training from Taser that speaks to
15    hitting somebody with a taser while they're running away.
16    But that's a different scenario.  Mr. Katsaris addresses
17    it as support for his opinion.  It's actually a different
18    type of scenario, but other than that, I haven't seen
19    anything.
20  Q. Can you tell me one way or the other what would result in
21     a more likely injury to a suspect, okay?  We have two
22     scenarios you told me.  We have the scenario -- well, the
23     scenario in general is you have an individual who is
24     handcuffed behind their back.  We talked about how they
25     may be immobilized or could be immobilized if they were to

Page 72

1   fall, they can't catch themselves.  We're also talking
2   about that same individual when they're handcuffed behind
3   their back if they were to get pulled -- if they were to
4   get stopped by an officer pulling on the handcuffs, I
5   think you said the injury may be to their shoulder or
6   shoulders.  Could you tell me one way or the other, in
7   either one of those scenarios, what would -- what would
8   precipitate or result in a greater injury, if you could?
9   What's more likely the scenario for the injury to result?
10      MR. PADDISON: Objection, calls for speculation,
11  you can answer to the extent you're able.
12  Q. (BY MS. DeROUIN): Sir, I'm just asking if you can tell me
13     one way or the other?
14  A. Well, I'm not your medical expert.  So I would be cautious
15     about extending my opinion too far in that regard.  My
16     common sense tells me that you're more likely to cause
17     significant lasting injury by grabbing the handcuffs and
18     essentially pulling back as someone's sprinting forward,
19     it would be like a -- when a dog comes off the porch and
20     he's on a chain and he goes across the yard at full run
21     and hits the end of the chain, that that has a very
22     significant potential for injury to the subject.
23             Tackling somebody, of course, could result
24     in injury.  In my opinion, it would be more likely that
25     there would be like a facial injury or something.  That's

Case 3:21-cv-10352-RHC-EAS   ECF No. 46-16, PageID.1307   Filed 05/11/22   Page 21 of 33

Darrin VanPelt v
Aaron Layne and City of Detroit

Steven Ashley

Steven Ashley - Vol. I
April 12, 2022

Page 73

1  the construct that's usually cast regarding the taser
2  deployment that a person can't break their fall so they're
3  going to fall face first into the concrete or whatever.
4  And there have been cases where that's happened, although
5  very few as far as I know.
6          As far as the likelihood of a hip injury,
7  that seems even less likely because of the dynamic
8  involved. But again, you know, I'm not the sports
9  physiologist or the football team trainer or the medical
10  expert to try to put things in a, you know, different
11  degrees of likelihood. My gut tells me that it would be
12  much more typical. Having chased individuals that were
13  running away before, my gut tells me it would be much more
14  damaging to grab somebody by the handcuffs and yank back
15  on them while they're running away from me.
16 Q. Okay. And I can appreciate you're not a medical doctor
17  and I was just asking if you could tell me one way or the
18  other, but it seems like you're telling me with that
19  caveat that you're not a medical doctor, that you believe
20  the injury would be greater with one stopping somebody by
21  the officers stopping somebody by the handcuffs and I
22  think you mentioned with regard to a tackle, yes, you can
23  see where they sustain a facial injury, but you can't rule
24  out that in addition to a facial injury, they could
25  sustain a closed head injury, correct?

Page 74

1 A. I can't rule anything out. Anything's possible.
2 Q. Sure. And they could sustain a fractured bone by not
3  being able to catch themselves, such as a hip fracture,
4  correct?
5 A. Anything's possible.
6 Q. Yeah. So it's just as well possible that an injury or a
7  significant injury could result by an officer stopping
8  someone by the handcuffs as it would be if they were to
9  tackle them while they're handcuffed behind their back,
10  correct?
11 A. Again, anything's possible.
12 Q. Sure.
13 A. I base my opinions on likely outcomes and that's what
14  officers are trained to do to base their decisionmaking on
15  likely outcomes.
16 Q. Okay. And I did see your footnote on 120 -- Footnote 121
17  page 24 where you talk about the taser and you talk about
18  how officers are not, you would agree, that officers are
19  not trained to tase someone from behind or deploy their
20  toyzer -- deploy their taser, excuse me, in the back of a
21  fleeing suspect, whether they're handcuffed or not, due to
22  immobilization, did I get that right?
23 A. Well, it's also dependent upon the nature of the situation
24  of a higher -- it's just a level of force.
25 Q. Absolutely. And let's just stick to a non-violent crime

Page 75

1  because I mean, with a violent crime, you and I would
2  probably both agree that a lot of things are out the
3  window at that point. But we're here, as you said this
4  case about a non-violent crime. So with regard to a
5  taser, and I can appreciate there was no taser used in
6  this case, but since you referenced it earlier on in your
7  testimony and you also put it in your report, I did want
8  to ask you a couple questions about that and you talk
9  about that you do agree that a taser should not be
10  utilized or deployed on a fleeing subject, whether they're
11  handcuffed or not, because of an immobilize issue and a
12  risk for injury. I'm just paraphrasing. Do I have that
13  right?
14 A. Generally, although, there's no hard-and-fast rule for it.
15  It's a cautionary note. In fact, I don't even recall if
16  it's specifically outlined in the Taser International
17  Training program. There have been a couple widely
18  circulated videos of it happening and it's not uncommon
19  for it to be talked about in a taser training class, but
20  it's certainly not a rule that says never do this. It's
21  -- it's situation specific.
22 Q. Okay. In your footnote, you write, quote, common taser
23  training does caution against deploying a taser in the
24  back of a fleeing subject, but this is due to the
25  likelihood that not only would somebody be unable to break

Page 76

1  their fall with their arms and then you go on. Do you see
2  that?
3 A. Yes.
4 Q. And the only reason I'm short cutting it is because the
5  reference that you make to common taser training does
6  caution in. So you would agree with me that you were
7  aware of some type of training course out there or manual
8  that does caution this type of use for the taser in that
9  particular scenario, correct?
10 A. No, that's not correct. I'm not aware of it. At this
11  point, I'm not aware of a specific outline or training
12  manual that speaks to it. I just know that it's common to
13  talk about it in taser training as part of the general
14  discussion of deployment and one of the main ideas that
15  taser training tries to get across to users is that as
16  with all levels of force, an officer has to think about
17  whether that level of force was justified in that
18  particular circumstance and particularly with taser, they
19  also have to think about what happens after they use the
20  force. If the person's up in a high place, are they going
21  to fall, you know, from the third fall or fire escape sort
22  of thing, if they're up in the tree or whatever, the
23  secondary effect of locking somebody up with a taser and
24  this is usually putting that in that framework. You know,
25  not just is the person doing enough that would justify the

Case 3:21-cv-10352-RHC-EAS   ECF No. 46-16, PageID.1308   Filed 05/11/22   Page 22 of 33

Darrin VanPelt v
Aaron Layne and City of Detroit

Steven Ashley

Steven Ashley - Vol. I
April 12, 2022

Page 77

1  use of the taser, but also recognizing the likelihood of
2  them being seriously injured by the fall after the
3  deployment of the taser, you need the factor that into
4  your decisionmaking. Sort of a next level analysis that
5  officers are cautioned about and so that's what this is
6  referring to.
7  Q. What would cause the arrestee or suspect that's fleeing to
8  fall if they're tased?
9  A. When someone -- when you deploy a taser into someone, this
10  assumes that there's a good circuit from the taser and
11  what we call a lockup and if you've seen videos online,
12  it's not uncommon if you get a good probe spread on the
13  taser deployment, a good circuit, if you will, where
14  there's a lot of muscle mass between the probe sites and
15  the body, it's not uncommon for the person to essentially
16  lockup like a board, if you will, and they just fall over
17  and they're not able to, you know, twist their body or
18  move their arms or really anything. In that context then,
19  you know, it's different than a tackle even with somebody
20  that's handcuffed where they still have the ability to
21  turn their body, take the impact on their shoulder or
22  whatever with a taser, it has a tendency to lock people up
23  and they just fall over.
24  Q. So in general if somebody's running and they are tased
25  from behind, you say they lockup and then they fall

Page 78

1  forward, correct?
2  A. Typically, yes. The cautionary note also usually speaks
3  to and this -- again, this is a discussion that usually
4  happens in class. It happened in a lot of my classes when
5  I was teaching tasers. What are they going to fall on.
6  You know, are they running across a lawn, are they running
7  across a concrete surface, you know, are they going to
8  fall and hit their head on a curb, those are some of the
9  examples I can think of actually incident videos that I've
10  seen where people have, you know, taken that kind of fall,
11  but they're literally not able to even twist their body or
12  anything, they just go down.
13  Q. Isn't it also around along the same logic that if you have
14  a fleeing subject who's handcuffed behind his back and an
15  officer like lunges forward at him, more than likely that
16  arrestee or suspect is going to fall forward?
17  MR. PADDISON: Objection, calls for speculation,
18  you can answer.
19  A. I would expect them to fall forward in some regard. I'm
20  just drawing a distinction between their ability to twist
21  their body as opposed to the taser hit and the only reason
22  really that I drill down into the taser example in my
23  report is to counter what Mr. Katsaris was saying about
24  it's the same thing. It's not quite the same thing. The
25  dynamic is different. The reaction to the deployment is

Page 79

1  different and that's the only --
2  Q. (BY MS. DeROUIN): Go ahead.
3  A. That's the only thing I was trying -- that's the only
4  point I was trying to make.
5  Q. I understand. And with regard to a taser one being tased,
6  I've never been tased before, but one being tased, they
7  would -- you would agree with me that they would lose
8  their mobility to use their arms and hands, correct, among
9  other body parts?
10  A. Generally, yes, although it doesn't always lock people up
11  fully, but in the context we're talking about, generally,
12  yes.
13  Q. Okay. And with regard to handcuffing a similarity would
14  be if one's handcuffed behind their back and they were to
15  fall forward, they would lose their ability to use their
16  hands and arms to catch themselves, is that true?
17  A. I would say generally that's the case, yes.
18  Q. So the distinction you're making why this is not compared
19  to a taser case, as you put in your footnote, I understand
20  your statement, is that the person that has their hands
21  and arms handcuffed behind their back, they still would
22  have a possibility of being able to twist in order to help
23  their fall, is that what you're saying?
24  A. Yes, to twist, to lift their head up, you know, when
25  they're going to make the impact as opposed to just

Page 80

1  falling down flat without the ability to do any of those
2  things. Yeah, that's -- to me that's the primary
3  difference and it's not -- and again, my primary point in
4  doing this explanation in my report was to illustrate that
5  it's not the same thing. Mr. Katsaris seems to draw the
6  conclusion that it's exactly the same thing. It's not.
7  Q. Is there any --
8  A. The idea --
9  Q. Is there any -- go ahead.
10  A. I was just going to say the idea that officers are trained
11  generally not to deploy a taser into the back of a running
12  suspect does not translate to officers are trained to
13  never tackle a running suspect. That's my main --
14  Q. Okay.
15  A. My main point.
16  Q. Sure. I just want to make sure we covered it at all. Is
17  there any other distinction, sir, that you can think of
18  between the taser immobilization and the handcuffed behind
19  the back immobilize other than we talked about how it's
20  your opinion the person that's immobilized by handcuffed
21  could still attempt to catch themselves in some
22  circumstances by twisting that we haven't discussed, is
23  there anything else that you can think of that's a
24  distinction between the two?
25  A. Off the top of my head --

Page 81

1  Q. That you haven't already told me?
2  A. Off the top of my head, I can't think of anything we
3     haven't talked about.
4  Q. Okay. And I just want to make sure the statement that you
5     made, the complete statement you made on Footnote 121 on
6     page 24, you don't -- you're not making any changes behind
7     that, you stand behind that statement, correct?
8  A. I'm reading through it. Give me just a moment.
9  Q. Oh, you're fine. Look up when you're done. That's fine.
10 A. Okay. Yes, I stand behind that statement, yes. In
11    mindful of your time, Ms. Amy, didn't you have a 1 o'clock
12    required stopping time for some other case you have or
13    something?
14 Q. Full disclosure at 1:30, I have a very important meeting
15    with my son who's a kindergarten at his school, but I will
16    be done well before then.
17 A. Well, you gotta make your priorities.
18 Q. And I think that's most important honestly. So nope, I'm
19    watching the clock and we'll get out, but my kindergartner
20    has a meet-and-greet that both my husband and I will be at
21    running right from the offices. So yep, thank you.
22 A. I do not want to run a foul with your kindergartner's
23    wrath, so --
24 Q. I know. Or the disappointment, right, I never want to do
25    that, but I'm sure I'll disappointment once in awhile.

Page 82

1              I just -- I will. I just have a couple more
2     areas to go through. The only thing is you have a pretty
3     lengthy report. So I am kind of short circuit some of
4     this stuff.
5  A. I understand.
6  Q. Okay. It would have been easier if you gave me a one-page
7     report.
8              MS. DeROUIN: If you want to take a break, Greg,
9     that's fine.
10             MR. PADDISON: I just want to fill up my water
11    bottle. That's just about it.
12             (Off the record at 12:02 p.m.)
13             (Back on the record at 12:06 p.m.)
14 Q. (BY MS. DeROUIN): In general, Mr. Ashley, are law
15    enforcement officers allowed to implement procedures that
16    they are not trained in?
17 A. In general, yes, because it's not possible to train them
18    on every possible situation or context. If you're talking
19    about specific weapons, for example, an officer that
20    hasn't been trained with his baton generally is expected
21    to not use a baton. But in terms of general techniques
22    and tactics, something that -- just because something
23    isn't trained to a level of specificity, doesn't
24    necessarily mean that an officer can't do that.
25 Q. How about should they, should they be utilizing a

Page 83

1     procedure or a technique during an arrest that they have
2     not been trained on in your opinion?
3  A. Well, my general risk manager opinion is that they should
4     do things that they've been trained on. But that's the
5     reason we have procedural guidelines and not big thick
6     manuals full of, you know, mandated rules because they're
7     out there and each situation evolves differently and they
8     have to have a flexibility to sort of figure that out.
9     What we expect them to do is what other officers typically
10    would, you know, believe would be an appropriate response
11    to a given situation.
12 Q. So with respect to a tackle or a takedown, however, you
13    want to call it, if a law enforcement offer is not,
14    officer, excuse me, is not trained in that particular area
15    with respect to taking down a fleeing suspect from behind
16    who is handcuffed while engaged in a non-violent crime, is
17    it your opinion that they should not do that?
18 A. I would say that it generally would be matter for officers
19    to use tactics and techniques that they've been trained on
20    in situations where they can do that. But also
21    acknowledging that there's an infinite number of
22    possibilities and as long as what they do is generally
23    within the realm of something that would be seen as
24    appropriate by their officers given circumstances, then
25    there's always -- well, there's frequently something else

Page 84

1     that could have been done. The question is what was done
2     appropriate under the circumstances whether the officer
3     believed that that was a typical appropriate response.
4  Q. Sure. As you know, and you're well versed in the law, I
5     know you're not a lawyer, but I know in your report, you
6     said it's very prominent in precedential cases with regard
7     to Grand v. Conner and all the others cases, you
8     understand that the standard is based on the totality of
9     the circumstances and based upon a reasonably prudent
10    police officer is what you're referring to, correct?
11 A. Reasonably objective police officer, but yes.
12 Q. Sure. Okay. And I just want to make sure that you're not
13    aware of any law enforcement manual, no matter what the
14    that name of it is, any law enforcement manual that would
15    train a law enforcement officer to takedown somebody from
16    behind while they're engaged in a non-violent crime and
17    handcuffed while they're running from the officer, you're
18    not aware of any manual or training program, correct?
19 A. I'm not aware of any manual or training program that
20    either authorizes that or prevents it.
21 Q. Also too, I know from what you reviewed, you reviewed the
22    -- or I'll start with this one. You reviewed Mr.
23    VanPelt's deposition transcript in this case, right?
24 A. Yes.
25 Q. Okay. And I know you saw his deposition testimony and

Page 85

1  pertinent parts where he talks about how his version of
2  events on how Defendant Layne he said wrapped his arms
3  around him between his waist and his knees and lifted him
4  off the ground, as he called it airborne, and slammed him
5  down on the ground. Do you recall that testimony?
6 A. Generally, yes.
7 Q. Okay. And it looks like, I think, you referenced also in
8  your report the Devin Searcy, Devin Searcy was the front
9  seat passenger in the car of Mr. VanPelt at the time of
10  the incident and you recall Devin Searcy, right?
11 A. Right. Can you tell me what page you're on, Counsel. I
12  know that I --
13 Q. Yep.
14 A. -- I focused some of this in my report.
15 Q. Yeah, you're fine. Oh, I'm sorry. With -- I can give you
16  the dep transcript, but I know you mentioned Devin Searcy
17  a couple times. I did not handwrite down where you
18  referenced him. If you want to take a look, you can, but
19  I'm just going to ask you generally about his statements.
20  So take a minute.
21 A. What I recall is that Mr. Searcy made two statements and
22  the second one, he spoke to -- sorry. He spoke to what
23  Mr. VanPelt had said essentially.
24 Q. Yeah, I'm sorry. Mr. Ashley, I did quickly find it. Page
25  18 of your report.

Page 86

1 A. Ah, thank you.
2 Q. You're welcome.
3 A. Back up here.
4 Q. You may have referenced it other places, but where, I
5  guess, have a post it now is on page 18. We can start
6  there.
7 A. I understand. Okay. Yeah.
8 Q. Okay. I know you're putting -- what I want to ask you on,
9  sir, is the statement he made you referenced, the June 17,
10  2019 statement. He makes to the force investigation
11  investigators, okay?
12 A. Mm-hm, yes.
13 Q. And I did see it because you talk about the Searcy also
14  related that when VanPelt ran away, the white officer
15  tackled VanPelt and slammed him on his left side. Searcy
16  related that the officer recovered drugs from VanPelt
17  after he was slammed to the ground by the white officer
18  and the white officer pulled VanPelt's pants and boxers
19  down to his side area, correct? And that's what it says?
20 A. That's what it says, yes.
21 Q. That's all I'm asking. And I can see that you probably
22  paraphrased this, but when I went back to the statement on
23  June 17th, 2019, another fact that Devin Searcy stated in
24  his interview is that VanPelt was picked up off the
25  ground. Is there a reason why you did not put that

Page 87

1  reference in your report?
2 A. No, this quote is from the final administrative review
3  from Sergeant Holston. I'm quoting Sergeant Holston's
4  relation of the -- of the statement.
5 Q. Okay. You were provided Devin Searcy's interview
6  statement on June 17th, 2019 for you to read, correct?
7 A. Yes.
8 Q. And you would agree with me that it would be important to
9  read the entire statement as opposed to a quote from an
10  interview investigation report, correct?
11 A. That's correct, I would agree with that, yes.
12 Q. Okay. In general with regard to the statement that's --
13  his actual statement, Devin Searcy that's dated June 17 of
14  2019, it's found on -- I believe, it was provided the
15  transcript is page eight and he does reference in his
16  interview that VanPelt was picked up off the ground just
17  as VanPelt testified to. Would that be an important fact
18  to you to consider in your opinion with regard to Mr.
19  Layne's actions against Mr. VanPelt in this case?
20 A. I mean, I would read it. I wasn't trying to reflect
21  everything Searcy said in this paraphrasing here. So is
22  it important to me that he said the same thing that his
23  friend said, only to the extent that he said the same
24  thing his friend said.
25 Q. No, I think what I'm asking is and that's fair. If you're

Page 88

1  not following it's totally probably my line of
2  questioning. But in general, I'm asking about that
3  particular point. Would that particular point that what
4  Mr. VanPelt has testified to and what Mr. Devin Searcy has
5  stated that Mr. VanPelt was picked up off the ground prior
6  to being slammed on the ground, would that be important to
7  you in your analysis with regard to whether Defendant
8  Layne's actions were reasonable and necessary at the time
9  given the totality of the circumstances?
10 A. I'm always uncomfortable when an attorney wants to know if
11  something was important to me because everything in the
12  record is important to me. In this context, something
13  that happens in four seconds observed by a person 75 feet
14  away and they said it during their second interview, it's
15  not my position as an expert to determine credibility.
16  So, you know, it doesn't take on the air of the officer
17  said this, but Searcy said this. You know, I certainly
18  read everything and reviewed everything generally as --
19 Q. Sure, go ahead.
20 A. I was just -- generally, I was just try to illustrate a
21  recap of what Searcy said. I wasn't try to draw a
22  distinction between whether he was picked up off -- it
23  looked like he was picked up off the ground or not at that
24  time.
25 Q. Did you consider though the fact or one of the factors in

Page 89

1  the totality of the circumstances in this takedown that
2  Mr. VanPelt testified and so did Mr. Searcy stated that
3  VanPelt was picked up off the ground, did you consider
4  that in your analysis at all?
5  A. Well, I consider everything in the record provided to me
6  in my analysis. I know that's a general statement, but
7  it's true. The fact is my analysis goes to the officer's
8  perception of what's happening and how that informs their
9  action. Whether VanPelt was picked up off the ground,
10  whether it looked like he was picked up off the ground,
11  whether during a tackle, his feet left the ground because
12  that's what happens in the tackle, you know, I wasn't
13  there. So I can't put that level of specificity on it.
14      If the allegation is that Layne
15  intentionally picked him up and slammed him down, you
16  know, I guess, it takes on a different air in that case,
17  but again, we're talking about something that happens in
18  four seconds or less. At which point the officer is
19  probably still mentally shifting into fully as the guys
20  running as opposed to gee, it's nice and compliant and
21  docile and going along with me. So whether his mind
22  actually had made that total shift at that point, I don't
23  know. It's -- it's attributing a lot of cool, calm
24  analysis time to an officer to say in that four seconds or
25  less, he was able to make that determination the best

Page 90

1  thing to do here is pick him up off the ground and slam
2  him down as opposed to just to hitting him on a running
3  tackle.
4  Q. Sure. And assuming we believe that Mr. VanPelt and
5  assuming for the sake of this question that we believe Mr.
6  VanPelt and Mr. Searcy's version of events that Mr.
7  VanPelt did run, he was patted down already, we've already
8  been through that, he's handcuffed behind his back, but
9  then Defendant Layne wrapped his arms around VanPelt
10  somewhere between his waist and knees picking him up off
11  the ground and slamming him to the ground, did you have
12  any opinion whether that would be a logical and
13  appropriate response by Defendant Layne given those
14  circumstances or factors?
15  A. I guess, I'm uncomfortable making that kind of analysis in
16  the short timeframe and as a hypothetical. So in order to
17  determine whether it would be an appropriate and logical
18  reaction on the part of the officer, I would have to
19  assume that the officer made that kind of analysis in that
20  four seconds or less timeframe while he's running after
21  somebody that all of a sudden took off running. And I
22  can't make that leap.
23      So absent that, whether or not VanPelt's
24  feet left the ground during the tackle, you know, how
25  would I know whether Layne intended that or not? In order

Page 91

1  for him to intend that, he would have had to have been
2  able to make that detailed analysis in the middle of all
3  that happening in four seconds or less. In my experience,
4  that's an unlikely analysis to be made in that short of
5  timeframe.
6  Q. When you say it's an unlikely analysis to be made in that
7  short of timeframe, are you referring to Defendant Layne's
8  analysis or are you referring to your analysis with regard
9  to this hypothetical?
10  A. Well, I'm talking about Layne being able to make that kind
11  of an analysis in that short timeframe.
12  Q. Well, when you're talking about the reasonableness of the
13  actions of an officer, you would agree with me that intent
14  of the officer does not matter, is that true?
15  A. Depending on what you mean by intent. If I understand
16  where I think you're going, I don't think intent is as
17  much an element of this as no matter what the officer
18  intended was the decision to do what he did likely to be a
19  similar decision that other officers would make under
20  similar circumstances.
21      In other words, what it comes down to is
22  would other officers, placed in the same set of
23  circumstances, believe that it was appropriate and logical
24  to tackle the guy that's running away and my opinion of
25  that is yes, they would.

Page 92

1  Q. And again, I'm asking you with regard to Mr. VanPelt and
2  Mr. Searcy's version of the facts, not just tackling Mr.
3  VanPelt by based on how Defendant Layne testified how the
4  tackle or takedown happened, but I'm asking you in this
5  question with given these totality of the circumstances
6  with both Mr. VanPelt's and Mr. Searcy stating and
7  testifying that Mr. VanPelt was picked up off the ground
8  between his waist and his knees before he was slammed to
9  the ground, I'm asking you whether or not you have an
10  opinion one way or the other whether or not that was
11  reasonable and necessary force given the totality of the
12  circumstances?
13  A. The picking up off the ground.
14  Q. Yes. Based on what Mr. VanPelt testified to and Mr.
15  Searcy stated?
16  A. I would have to spend some time thinking about that. My
17  analysis goes to whether the officer's decisionmaking was
18  appropriate under the circumstances and whether somebody
19  else believed that he was picked up off the ground,
20  whether a witness 75 feet away believed that he was picked
21  up off the ground at the end of that four-second foot
22  sprint. I mean, that's a question for the trier of fact
23  to decide who they believe.
24      Whether -- to a certain extent, I think
25  we're trying to break the tackle down into it's component

Case 3:21-cv-10352-RHC-EAS   ECF No. 46-16, PageID.1312   Filed 05/11/22   Page 26 of 33

Darrin VanPelt v
Aaron Layne and City of Detroit

Steven Ashley

Steven Ashley - Vol. I
April 12, 2022

Page 93

1 parts, which doesn't necessarily translate because of the
2 short timeframe.
3 Q. So you can't tell me one way or the other, correct, you
4 don't have an opinion on that and you leave it to the
5 trier of fact, is that what you're saying?
6 A. Well, the whole thing left to the trier of fact, but my
7 opinion is that officers would have believed that what
8 Officer Layne -- other officers could believe what Officer
9 Layne did was logical and appropriate under the
10 circumstances, that's my opinion.
11 Q. And then you're saying that with regard to what I'm asking
12 you, I just want to make sure, that picking him up off
13 ground, Defendant Layne picking Mr. VanPelt off the
14 ground, you're saying it's your opinion other reasonable
15 officers would believe that that would be reasonable that
16 Defendant Layne did that, is that what you're saying?
17 A. I'm saying that other reasonable officers would of
18 believed that it was appropriate and logical to tackle the
19 running suspect in that short timeframe. I just don't
20 know that the quote-on-quote picking him up off the ground
21 -- I mean, to a certain extent every tackle is probably
22 going to involve the subject's feet leaving the ground.
23 So we're trying to put a very fine point on something that
24 I don't know that we can put a very fine point on.
25 Q. If you're generally speaking that reasonably prudent

Page 94

1 officers believed defendant's action, Defendant Layne's
2 actions of tackling of a running suspect were reasonable,
3 are you just saying in general, just tackling a running
4 suspect you're not giving any difference to or credits,
5 excuse me, to a suspect in this case being handcuffed
6 behind his back or anything? When you say you're
7 generally saying tackling a running suspect, you would
8 agree with me there's other factors in this case that
9 we've been talking for at length, correct?
10 A. Well, there are other factors, I agree with that. I'm
11 not --
12 Q. And I --
13 A. I'm not -- I'm sorry. I'm not trying to exclude the fact
14 that he's handcuffed behind his back. I just wasn't, you
15 know, trying to make my sentences long and involved. In
16 this situation, in this situation, as it evolved on this
17 particular day and time in the context that the tackle was
18 done, it's my opinion that other officers, under similar
19 circumstances, could of believed that what Officer Layne
20 did was logical and appropriate.
21 Q. Okay. And that's based on Defendant Layne's version of
22 events? And all I'm asking you, and we can move on, all
23 I'm asking you with this particular hypothetical is do you
24 have an opinion if you add one more factor to it, if you
25 take Mr. VanPelt's testimony to be true or Mr. Searcy's

Page 95

1 statement to the true because he will be called to testify
2 at trial, if you take their positions to be true or their
3 testimony to be true that in addition to Mr. -- excuse me,
4 Defendant Layne before he tackles Mr. VanPelt, he picked
5 him up, he picked him up off the ground between his waist
6 and knees and he slammed him on the ground. All I'm
7 asking would that be, how about I use your own words,
8 logical and appropriate response by Defendant Layne given
9 those additional details just assuming that testimony that
10 Mr. VanPelt to be true, that's all I'm asking?
11 MR. PADDISON: Objection, calls for speculation,
12 asked and answered and you can answer.
13 A. I'm not sure how to put a finer point on my answer,
14 Counselor. I'm really not trying to be obstinate about
15 it. I'm just what you're talking about are VanPelt and
16 Searcy describing the tackle as they observed it or they
17 think they observed it. What I'm talking about is the
18 fact that it was a tackle. The fact that somebody's feet
19 left the ground during the tackle. How far off the ground
20 did the feet go, I don't know. I'm willing to bet none of
21 them actually know either. So what does it mean that
22 picked him up off the ground and slam him down, a tackle
23 by it's nature is hitting somebody and knocking them to
24 the ground.
25 So, you know, I'm uncomfortable with

Page 96

1 the idea that the implication seems to be that he -- that
2 Layne picked VanPelt up, slammed him to the ground, and
3 then tackled him. The picking him off his feet to the
4 ground is the tackle. He's going to come off the ground
5 when he does that. How far? I don't know and he doesn't
6 either. I'm sure. But the tackle is the tackle.
7 Officers tackle people all the time -- well, not all the
8 time, but fairly commonly running suspects, whether
9 they're handcuffed or not.
10 Q. (BY MS. DeROUIN): Are you aware, sir, of any training in
11 any type of law enforcement training at all that allows
12 for an officer to pick somebody up off the ground and slam
13 him to the ground as a form of tackling?
14 A. Again, I think you're speaking semantics. A tackle picks
15 somebody off the ground and takes them down. And as I
16 testified earlier, I'm not familiar with anything that
17 either says to do it or says not to do it, other than Mr.
18 Katsaris saying everybody knows that, which evidentially,
19 everybody doesn't.
20 Q. You referenced in your report on page 48, if you want to
21 get back to that, I just want to ask you a couple more
22 things and I'm about done. Let me know when you're there,
23 sir. I'm just going to have you look at something. And
24 --
25 A. All right. I'm there.

Page 97

1 Q. Okay. And your second opinion it says it is my opinion
2    that under similar tense uncertain, it rapidly evolving
3    circumstances, other officers would believe it's
4    appropriate to act as Layne did. Do you see that?
5 A. Yes.
6 Q. And if you flip to page 38 of your report, it looks like,
7    sir, that you went through and described those
8    circumstances. That's where I would like you to take a
9    minute and read page 38. So I'll I'm going to ask you and
10   then I'll stop talking and let you read. All I'm going to
11   ask you is on page 38, would that accompany or include,
12   excuse me, it's been a long time, would this include all
13   the factors you're talking about to formulate that
14   opinion?
15 A. Generally, I guess. It may have been --
16 Q. And sorry. Page 39 you go onto talk about what's rapidly
17   evolving. All I'm asking is you summed up in your general
18   opinion, I know you told me earlier on in this deposition
19   that you also, of course, your opinions are throughout
20   with these statements and all I'm asking when you talk
21   about these factors of what do you call it? Similar
22   tense, uncertain, and rapidly evolving circumstances,
23   excuse me, those have been outlined on page 38 and 39?
24 A. Yes.
25 Q. I'm not missing anything?

Page 98

1 A. As far as I know, yes.
2 Q. Okay. There's also testimony been given by Mr. VanPelt, I
3    know you reviewed his deposition transcript, that after he
4    was already slammed down on the ground as he testified to
5    by Defendant Layne, he further testified that Defendant
6    Layne picked me up by my hair and he released me and he
7    let me fall directly back down on the same side that I was
8    injured on. Do you recall that testimony?
9 A. Not offhand. I don't dispute that he said that. I just
10   don't recall right offhand.
11 Q. Okay. I didn't see that you offered any kind of opinion
12   on that with regard to whether or not that action by
13   Defendant Layne was logical and an appropriate response.
14        As you sit here today, do you have an
15   opinion one way or the other whether or not that action by
16   Defendant Layne, as testified to by Mr. VanPelt, would
17   have been a logical and appropriate response given the
18   totality of the circumstances in this case?
19 A. That he says he picked him up by the hair and then he
20   dropped him back down on his injury?
21 Q. Yep, it's a quote from his dep transcript and I will read
22   the quote.
23 A. No, it's okay.
24 Q. Oh, you got it? Okay.
25 A. No, but I think I can answer it. I don't recall seeing

Page 99

1    that in the video. So whether it actually happened or
2    not, you know, would be up to the Jury to decide if they
3    believe VanPelt's version of events. I would say as a
4    hypothetical, once an officer takes a handcuffed suspect
5    down absent some other extenuating circumstance to pick
6    him up by the hair and drop him back down on his injury
7    would be inappropriate.
8 Q. Okay. We also hit on about the 75 feet. I heard you kind
9    of mention that maybe a couple questions, but I did want
10   to hit on that in your report. It's on page 47?
11 A. Yes.
12 Q. Again, I'm trying to move this long. I'm almost done.
13   Your report reflects on page 47 that in quote, part
14   quotes, and you can definitely read it yourself. That in
15   reaction to VanPelt's active resistance, Layne gave chase,
16   caught up to VanPelt in approximately 75 feet and took
17   VanPelt down by tackling him.
18 A. Yes.
19 Q. Did I quote that --
20 A. Yes.
21 Q. -- correctly? Okay. And can you tell me in generally
22   what do you base that on? And what I mean not about the
23   tackle, we're passed that, I'm only asking you about the
24   distance, what do you base your calculations on to get the
25   75 feet?

Page 100

1 A. Yes. I did a Google Earth measurement from the point
2    where the foot chase started to the point where the tackle
3    occurred and it's 75 feet and there's a screen capture of
4    that in the file that I'm going to provide that shows
5    that.
6 Q. Okay. And you reference this Google Earth measurement in
7    your footnote on that page, correct?
8 A. Yes.
9 Q. Okay. And you based it on the Google Earth measurement
10   you did and you also did a screen shot that you're going
11   to provide to your file, correct?
12 A. Yes.
13 Q. Okay. With regard to the testimony, and all I'm asking is
14   Defendant Layne testified that VanPelt had a 10- to
15   15-feet lead on him before defendant started running and
16   that he was able to catch up to him about 25 to 30 feet.
17   Do you recall that testimony that Defendant Layne offered
18   in this case?
19 A. Well, I recall that Layne estimated some distances that
20   were shorter than the 75 feet, yes.
21 Q. Okay. And also Mr. VanPelt testified that after he
22   panicked and ran, he said, quote, maybe 10-15 feet out
23   with handcuffs on, pants were sagging, he picked me up and
24   he slammed me down on the ground, page 13 of Mr. VanPelt's
25   dep testimony, again, did you consider the testimony of

Darrin VanPelt v
Aaron Layne and City of Detroit

Steven Ashley

Steven Ashley - Vol. I
April 12, 2022

Page 101

1 VanPelt as well where he was talking about running about
2 maybe 10 to 15 feet?
3 A. Did I consider it? I considered everything in the file.
4 The fact is it's extremely common for people involved in
5 situations to not closely estimate or accurately estimate
6 distances and times and things like that, that's extremely
7 common and I think that happened in both of those cases,
8 both of those individuals realizing --
9 Q. Okay.
10 A. I'm sorry. Let me just --
11 Q. Go ahead. Nope. Go ahead.
12 A. Realizing that if it was just in the 10-15 feet, the time
13 was even less, but the actual time was roughly four
14 seconds. So that's all, I guess.
15 Q. Let me ask you this way and I'm not trying to be
16 argumentative. I hope I wasn't argumentative at all in
17 this deposition. It's not my intent, but I'm just asking
18 you keep talking about four seconds and I'm going to
19 generally ask you what you base the four seconds on for
20 this incident to occur?
21 A. Normally, I would say use an on-screen display for the
22 body cams. I believe, in this case, the on-screen display
23 wasn't active. So I would of used it in the video player
24 software, you know, estimate to read the times and I
25 actually cite to that in Footnote 248, 7:37 into the

Page 102

1 recording from Layne's body worn camera the takedown
2 occurred at seven minutes and 40 seconds into the video.
3 So we're talking four seconds.
4 Q. Okay. Are you saying, and I'm just asking so I understand
5 your opinions. Are you saying in four seconds, Defendant
6 Layne was able to run approximately 75 feet? Do you think
7 that's probable?
8 A. Oh, yeah, I think it's definitely probable, yes.
9 Q. Okay. So -- and that's fine. Briefly going to page 25 of
10 your report.
11 A. All right.
12 Q. Okay. You make a statement that states, quote, while the
13 Detroit directives are based on an earlier version of the
14 continuum, levels of resistance and levels of control are
15 essentially the same. Do you see that?
16 A. Yes.
17 Q. And did I read that accurately?
18 A. I didn't follow along, but that's generally an accurate
19 statement, yes.
20 Q. Okay. All I'm asking, sir, you stated they are
21 essentially the same. Is there anything, as you sit here
22 today, that you can tell me that there would be any
23 differences to?
24 A. No, I don't think that part of the continuum was -- we're
25 just talking about the terminology and I don't recall any

Page 103

1 specific differences.
2 Q. Okay. Last but not least, you mentioned that you have a
3 file and that you're going to provide it to defense
4 counsel and one of the things in your file is your Google
5 Earth measurement. Can you tell me, since I don't have
6 your file today, can you tell me what other things you
7 have in your file that will be producing to defense
8 counsel that are not privileged?
9 A. Well, I mean, that I was provided and information on the
10 weather, information on the area, screen captures of the
11 area, both overhead views and street level views, the
12 measurement. There's some other measurements regarding
13 the location, you know, how far it was in the Southfield
14 freeway, etcetera.
15 Q. Those are the things you referenced in your report, right?
16 A. Yes. Everything --
17 Q. Okay.
18 A. Everything that's in my file is referenced in any document
19 review list at the end except, and I noticed this last
20 night when I was looking, I do have a footnote that cites
21 the Detroit Police use of force guideline, which is
22 Section 3.02, I believe. It's footnoted, but it's not
23 listed in any document review list. Somehow I missed
24 that. So the continuum training memorandum is, but the
25 policy isn't listed in the document review list, but it is

Page 104

1 listed and spelled out in the footnote and that's -- and I
2 put that on the -- in the file.
3 Q. Sir, in your file could I find any manual, publications,
4 Google searches, any additional research that you did with
5 respect to any of your opinions you provided to me today?
6 A. You won't --
7 Q. That you relied on, not that you issued, any manuals that
8 you relied on or anything the ones that I just mentioned?
9 A. You'll find a list in the document review list of
10 reference material, but as far as I know, everything on
11 there is copyrighted. So I don't provide, you know,
12 copies of --
13 Q. Sure.
14 A. -- books and stuff, but everything's listed should be easy
15 to locate.
16 Q. Sure. Sorry, I was -- all I'm trying to say is I know
17 it's listed in your report. I'm just saying since I don't
18 have your file, I just want to see if there's any other
19 manual you may have looked up last night and like oh, why
20 don't I print page -- you know, a particular page number
21 out of this manual because it may help me for my dep
22 tomorrow or to explain something to Amy, I'm just asking
23 is there anything additional than what you've already put
24 in your report that's in your file that you relied onto
25 offer any opinions today?

Case 3:21-cv-10352-RHC-EAS   ECF No. 46-16, PageID.1315   Filed 05/11/22   Page 29 of 33

Darrin VanPelt v
Aaron Layne and City of Detroit

Steven Ashley

Steven Ashley - Vol. I
April 12, 2022

Page 105

1  A. I didn't put anything into the file that wasn't part of my
2     report consideration, but there have been other things
3     that we talked about the beginning from FDLE and stuff,
4     those things aren't in the file because I did that
5     additional supplemental research after the report was
6     submitted.
7  Q. Okay.
8  A. But again, it doesn't change my opinion. Those are just
9     things that further underscore my opinions.
10 Q. Okay. And your opinions with regard to how you disagree
11    with Mr. Katsaris that you've testified to today and any
12    other disagreements would be, of course, found in your
13    report, correct?
14 A. As far as I know, yes.
15 Q. Okay. Is there anything, as you sit here today, that you
16    have any further disagreement with regard to Mr. Katsaris'
17    opinions that we have not talked about today or that are
18    not found in your report?
19 A. Mr. Katsaris spends time talking about, to a limited
20    degree, talking about the investigation, that typical
21    Monell type opinions, which I sort of address in my
22    report, but not specifically and Katsaris said this and I
23    disagree and here's why, I speak to those issues in the
24    report, the policies, the training, and things like that.
25       So I disagree with him in the respect that

Page 106

1     he says they didn't do an adequate job of all that stuff
2     and I disagree with that, but I didn't spell it out in
3     that way. I wasn't trying to attack Mr. Katsaris in my
4     report. The only reason I specifically addressed those
5     two points we talked about is because he specifically
6     points to those. So I felt like I had to counterpoint
7     respond to them.
8  Q. Okay. Anything else with regard to disagreements or
9     counterpoints to respond to Mr. Katsaris' opinions that we
10    haven't discussed today or in your report?
11 A. Off the top of my head, I can't think of anything.
12 Q. Okay. With that being said, I appreciate your time today.
13    It was very nice talking to you and meeting you. And I'll
14    hand it over to Mr. Paddison.
15 A. Thank you.
16    MR. PADDISON: Thank you.
17    EXAMINATION
18 BY MR. PADDISON:
19 Q. Mr. Ashley, just a couple quick follow-ups.
20       You were asked a moment ago about Mr.
21    VanPelt's allegations that he was picked up by his hair.
22    Do you recall that?
23 A. Yes.
24 Q. Okay. Now, we had the benefit of the body worn camera of
25    Officer Layne, is that correct?

Page 107

1  A. Yes.
2  Q. Okay. And I'm not sure if I provided this to you or not,
3     but are you aware of a PDF compilation showing the
4     frame-by-frame photographs of that body worn camera?
5  A. Yes.
6  Q. Okay. I'm going to share with you for a moment our screen
7     here and is this appearing on your screen?
8  A. Yes.
9  Q. Okay. And you see where it reads frame 3:40 towards the
10    bottom?
11 A. Yes.
12 Q. Based on your prior review of the body worn camera of
13    Officer Layne, do you -- can you recall where in the
14    sequence of events, this specific frame would have been
15    taken from?
16 A. As I recall, this was after the takedown looking back
17    toward the scout cars.
18 Q. Okay. And I'm going to roll through these frames and if
19    you need me to slow down, that's fine, but I'm going to
20    frame-by-frame here if I can. Is it whiting out for
21    everybody else?
22 A. Yeah.
23    MS. DeROUIN: Yeah, it did.
24 Q. (BY MR. PADDISON): All right. There we go. 3:45. Now,
25    at this point here, can you Officer Layne's hands on the

Page 108

1     screen?
2  A. Yes.
3  Q. Okay. And where do Officer Layne's hands appear to be?
4  A. It's a little hard to tell from the specific --
5     MS. DeROUIN: Right.
6  A. -- angle.
7  Q. (BY MR. PADDISON): Okay. At any point here, can you see
8     where Officer Layne's hands are?
9  A. I can see where his hands and arms are. I'm not quite
10    sure.
11 Q. Let me ask you this. Can you see Mr. VanPelt's head in
12    the screen shot here?
13 A. It looks like his head at Layne's left hand. I can't
14    quite tell from this.
15 Q. Okay. Does it appear as though Officer Layne has anything
16    in his left hand?
17 A. If I had -- it almost looks like he has a taser in his
18    left hand. I'm seeing the yellow.
19 Q. Okay.
20 A. Which would indicate a taser.
21 Q. Are you aware of Mr. VanPelt had yellow hair?
22 A. No.
23 Q. And can you see Officer Layne's right hand in the
24    photograph? We're at frame 3:59.
25 A. In my view, I think I can see it. It's heavily shadowed,

Case 3:21-cv-10352-RHC-EAS  ECF No. 46-16, PageID.1316  Filed 05/11/22  Page 30 of 33
Darrin VanPelt v Steven Ashley Steven Ashley - Vol. I
Aaron Layne and City of Detroit  April 12, 2022

Page 109

1 Greg.  So there we are.  Yes, I see it.
2 Q. Now, at this point, do you see Officer Layne's right hand?
3 A. Yes.
4 Q. Okay.  Can you tell where it is in relation to Mr.
5 VanPelt's body?
6 A. Looks like he's about to grab ahold of his jacket.
7 Q. And does -- can you see where his left hand is going or
8 his left wrist?
9 A. At the top of the frame, it looks like he's holding onto
10 the jacket.
11 Q. Okay.  And what brings you to that conclusion that he's
12 holding onto the jacket?
13 A. Just the way the fabric is pulled up.
14 Q. At this point, can we see both of Officer Layne's hands?
15 A. Yes.
16 Q. Okay.  And where is Officer Layne's left hand?
17 A. Same location.  I'm not sure if that's his taser in his
18 hand.  I can't quite tell.
19 Q. And where's his right hand?
20 A. It looks like it's supporting VanPelt's body on the
21 right-hand side.
22 Q. And about frame three -- four -- we'll call it 4:05, 4:06
23 we see what appears to be Mr. VanPelt begin to fall,
24 correct?
25 A. Yes.

Page 110

1 Q. At any point during that sequence, could you see observe
2 Officer Layne's hand on Mr. -- holding onto Mr. VanPelt's
3 hair?
4 A. No.
5 MS. DeROUIN: I'm just going to place objection to
6 foundation.  The video doesn't accurately describe the
7 whole thing, but that will be for the trier of fact to
8 determine, go ahead.
9 A. No.
10 Q. (BY MR. PADDISON)  You can answer.
11 A. No.
12 Q. You were -- a bit ago you were asked to speculate about
13 whether or not it would be a reasonable use of force if,
14 as Mr. VanPelt had alleged that he was picked up and
15 slammed to the ground, do you recall that?
16 A. Yes.
17 Q. Okay.  And you were uncomfortable determining that
18 because, I believe, I may be paraphrasing here, that it
19 was breaking down the tackle into very small chunks
20 instead of looking at the tackle as a single event.  I
21 know I'm paraphrasing.  Is that a fair assessment?
22 A. Yes.
23 Q. Okay.  Are you aware of any existing case law or precedent
24 that addresses a tackle or a body slam in the context of a
25 fleeing suspect who is handcuffed?

Page 111

1 A. Offhand, I'm not.  I don't recall anything specifically
2 right now.
3 Q. Okay.  I'm going to have you take a look here at a case
4 captioned Cutchin versus District of Columbia, the
5 citation is 369 F Sup 3D.  Do you see the highlighted
6 portion on your screen?
7 A. Yes.
8 Q. Okay.  If you could take a moment and read that
9 highlighted portion there, there is a slight continuation
10 on the next page.  Let me know when you're ready to scroll
11 down.
12 MS. DeROUIN: Just place an objection with regard
13 to this case law.  It's in partial part.  Mr. Ashley is
14 not an attorney.  I don't think he's an expert in
15 interpreting the constitutional laws of this country.
16 It's a non-binding opinion, but we'll go ahead and let him
17 read it.
18 A. Greg, you need to make that wider.  I can't read it.
19 Q. (BY MR. PADDISON)  Is that better?
20 A. Just a little more, please.  Okay.  Scroll.  Scroll.  All
21 right.
22 Q. Okay.  After having the opportunity to read a selection
23 from the opinion, does that have any impact on your
24 assessment of whether or not it matters, as far as
25 reasonableness is concerned, whether Mr. VanPelt was

Page 112

1 actually picked up and slammed down or was simply tackled
2 in the more generic and broad sense?
3 MS. DeROUIN: Objection to form, foundation, calls
4 for a legal conclusion, he is not an attorney in this case
5 and that case is completely just for facts in this case,
6 but you and I can argue that in further briefing, but go
7 ahead, Mr. Ashley.
8 A. It appears it would support my opinion.
9 Q. (BY MR. PADDISON)  Now, I want to return for a moment to
10 the frame-by-frame body worn camera and other videos.
11 Now, if I understand correctly, you reviewed
12 the body worn camera or Officer Layne, correct?
13 A. Yes.
14 Q. As well as the -- did you review the front facing dash
15 camera from Officer Layne's vehicle?
16 A. Yes.
17 Q. And did you review the rear facing camera from Officer
18 Layne's video?
19 A. Yes.
20 Q. Now, I would like to pull up here for a moment the
21 frame-by-frame of the rear facing camera here and it's
22 going to be shared with a couple of other sections here.
23 Let me pull this up.  Give me one moment.  Let's see here.
24 That what I'm looking for.  There we go.  Okay.  Now, you
25 see in the upper right-hand corner where it says rear seat

Case 3:21-cv-10352-RHC-EAS   ECF No. 46-16, PageID.1317   Filed 05/11/22   Page 31 of 33

| Darrin VanPelt v | Steven Ashley | Steven Ashley - Vol. I |
|---|---|---|
| Aaron Layne and City of Detroit | | April 12, 2022 |

Page 113

1 car camera?
2 A. Yes.
3 Q. Now, we're at frame 80, correct?
4 A. Yes.
5 Q. I would like to describe what you observed as I move
6     forward in rear seat car camera frame in the top right
7     corner, okay?
8 A. All right.  It appears that Officer Layne, during the
9     tackle, does not lift VanPelt's feet off the ground, but
10     that, in essence, VanPelt just sort of folds forward, you
11     know, going down to his knees first and then falls the
12     rest of the way down.
13 Q. And we finished here at frame 125 let's call it just for
14     sake of clean numbers here. I want to back up to frame 80
15     and I walk through this and I want you to tell me if at
16     any point during the sequence of events, you see the lead
17     figure, which presumably is Mr. VanPelt, lift upward in
18     the air, okay?
19 A. All right.  No.
20 Q. So at no point did you observe the lead figure, presumably
21     Mr. VanPelt, go upward?
22 A. That's correct.
23 Q. Okay.  You were asked some questions about officers
24     utilizing methods if they're trained on being preferred,
25     correct?

Page 114

1 A. Yes.
2 Q. Are officers, generally speaking, trained in takedowns,
3     Judo maneuvers, and basic hand-to-hand combat?
4 A. Generally, yes.
5 Q. Okay.  Do you happen to know if that is part of the
6     training within the Detroit Police Academy?
7 A. My understanding is that they -- Detroit Police Academy
8     meets the M-COLES training objectives.  So yes, it would
9     be included.
10 Q. So hands-on, takedowns, and physical maneuvers would be
11     part of their training, correct?
12 A. Yes, it's standardized in the State of Michigan.
13 Q. Is there anything that you're aware of that requires
14     officers to always use the best possible method of
15     detaining a fleeing suspect?
16 A. Best possible method?
17 Q. Right.  Are they required to use the best possible method?
18 A. No, there's nothing that requires that. It's just what
19     they did has to be reasonable under the circumstances.
20 Q. And going back to these trainings all the trainings you've
21     been in, been apart of, taught yourself, do those
22     trainings generally cover the only methods or specific use
23     of force tactics or are they intended to be guidelines
24     that include specific prohibitions?
25 A. They intend to be general guidelines and specific

Page 115

1 techniques are taught, you know, in this situation, here's
2     a couple different things you can do, that sort of
3     context. It's just not possible to cover every possible
4     delineation of tactics and techniques.
5 Q. Okay.  As far as you know, are those trainings ever been
6     intended to be an all inclusive list of different methods
7     an officer can use?
8     MS. DeROUIN: Objection to foundation, go ahead.
9 A. No, I've never heard them cast in that way or that they're
10     intended to be exhaustive, you know, unless we talk about
11     it here, there's nothing else that you could possibly do,
12     I've never heard it cast that way.
13 Q. (BY MR. PADDISON):  Okay.  Now --
14 A. That would be foolish to try to cast it that way.
15 Q. And Mr. VanPelt was patted down by Officer Layne initially
16     when he stepped out of his car, correct?
17 A. As I recall, yes.
18 Q. Okay.  And after Mr. VanPelt was handcuffed and moved over
19     near Officer Layne's car, did Officer Layne ask Mr.
20     VanPelt if he had anything else on him?
21 A. Yes.
22 Q. Okay.  And what did -- if you recall, what did Mr. VanPelt
23     respond?
24 A. As I recall, he said no, he didn't.
25 Q. Okay.  Now, when it comes to doing roadside pat downs or

Page 116

1 searches, are there privacy concerns that an officer may
2     have?
3 A. In terms of privacy of the suspect?
4 Q. Correct.
5 A. There are some limitations depending on the circumstances.
6     You wouldn't ask someone to disrobe by the roadside, for
7     example.
8 Q. Okay.  So an item that was lodged in someone's butt
9     cheeks, for example, generally wouldn't uncovered on a
10     routine traffic side pat down, is that fair?
11 A. That's probably fair.  That would probably be discovered
12     normally at the lockup.
13 Q. And that brings me to my next question.  The pat down that
14     occurs in the street is that generally speaking the case
15     of an arrestee, the only pat down or search of the person
16     or are there additional searches that happen later?
17 A. There are additional searches that happen later.
18 Q. Okay.  And those are within the generally at the jail
19     location?
20 A. Generally, although, you know, after the initial pat down
21     if the mood or temperament of the suspect shifts somehow
22     or if there's some other external stimuli that indicate
23     that an officer better take a better look, there may be
24     additional, it just depends on the circumstances.
25 Q. Okay.  And then one final question we covered this.  I

Case 3:21-cv-10352-RHC-EAS ECF No. 46-16, PageID.1318 Filed 05/11/22 Page 32 of 33

Darrin VanPelt v
Aaron Layne and City of Detroit

Steven Ashley

Steven Ashley - Vol. I
April 12, 2022

Page 117

1   just want to make sure we're perfectly clear. Return to
2   page 48 of your opinion, specifically the paragraph titled
3   opinions. That begins there with the paragraph before you
4   list them, number one, it states that these opinions are a
5   reiteration of those presented earlier in the executive
6   summary of the report, did I read that correctly?
7 A. Yes.
8 Q. Okay. So the four opinions listed in paragraph bolded 19,
9   is that just a summary of the primary opinions or is that
10   an all inclusive list of everything you formed during the
11   course of this case?
12 A. This is a re-statement. I mean, the opinions are
13   initially stated at the beginning to make it simple for
14   Judges to not have to read the whole report initially and
15   then this is a re-statement of what is part of the
16   executive summary and then these are in addition to any
17   statements or opinions I may have expressed in the body of
18   that report.
19 Q. Mr. Ashley, that's all I've got. Thank you very much.
20      MS. DeROUIN: I have a couple more. Thank you.
21      RE-EXAMINATION
22   BY MS. DeROUIN:
23 Q. I have a couple more follow-up after Mr. Paddison's
24   re-direct.
25      Mr. Ashley, you would agree with me that the

Page 118

1   purpose of a search or a pat down during a traffic stop is
2   to search for weapons or other illegal contraband,
3   correct?
4 A. The purpose is to search for weapons primarily.
5 Q. Sure. Officer safety, correct?
6 A. That's true, yes.
7 Q. And officers are trained to do a proper and routine
8   search, complete search that we already talked about via
9   pat down in order to obtain any weapons on that person or
10   illegal contraband, correct?
11 A. Generally, it's focused on weapons.
12 Q. Okay. A weapon such as a gun, you would agree with me,
13   could be found during a pat down, correct? If somebody
14   has a gun on their person, those guns are usually found
15   during a pat down if an officer does a pat down full and
16   complete as you testified earlier to me, correct?
17 A. Typically, a gun would be found, but not always.
18 Q. But it's more typical or more likely than not that an
19   officer who does a complete pat down by his training that
20   he's been trained on, whether it be the police academy or
21   any type of post police officer training, would pat down
22   to find a gun, correct?
23 A. Typically, that would be the case, but there have been
24   cases where officers have not found guns because of where
25   they're secreted.

Page 119

1 Q. And if -- and if -- never mind on that.
2      You were asked to look at frame-by-frame
3   analysis as defense counsel did with regard to the second
4   incident we were talking about while Mr. VanPelt was on
5   the ground after the tackle. Do you recall that?
6 A. Yes.
7 Q. And it's fair to say by looking at that video any which
8   way; upside-down, frame-by-frame, you can't tell one way
9   or the other whether or not Defendant Layne, indeed,
10   grabbed Mr. VanPelt's hair and pulled him up and dropped
11   him, correct?
12 A. I don't see any indication that he grabbed him by the hair
13   and picked him up and dropped him.
14 Q. And you can see that from the video is what you're relying
15   on?
16 A. What I said was I don't see any indication that he did
17   that in the video.
18 Q. Tackle versus a body slam, you would agree with me that
19   those are two different things, correct?
20 A. You're using very generic terms, but, you know, a tackle
21   is different than a body slam the way I'm thinking about a
22   body slam, yes.
23 Q. Sure. And with regard to a tackle, you were asked
24   questions about the tackle and you were asked to compare
25   it to the case that, I believe, is Cutchin vs. DC. Let me

Page 120

1   first ask you this. You didn't review Cutchin vs. DC and
2   use that to formulate any opinions in this case, did you?
3 A. No.
4 Q. Okay. And you would agree with me that these kind of
5   cases, in particular whether or not Defendant Layne
6   deployed excessive or unnecessary force against Mr.
7   VanPelt, would be determined by the totality of the
8   circumstances, correct?
9 A. Could you restate that, Counselor?
10 Q. Sure. And you understand when you do these review of
11   these cases and you offer an opinion with regard to
12   whether or not in this particular case, the Defendant
13   Layne's force was reasonable or not, you understand it's
14   based upon, as you told me prior, that it's based on the
15   totality of the circumstances, correct, in that given
16   moment that the officer is faced with, correct?
17 A. It is based on totality of the circumstances. However, I
18   don't offer an opinion that the force was reasonable.
19 Q. Sure. You can't offer that opinion, correct?
20 A. That's not for me to decide. That's for the trier of
21   fact.
22 Q. No, I understand that. But in general with regard to your
23   analysis and whether or not you are of the opinion that
24   Defendant Layne's actions are, I can use your own words.
25   Just one second.

**Page 121**

1 A. Appropriate and logical.

2 Q. Sure. Thank you. Appropriate and logical, you need to
3    determine the entire totality of the circumstances,
4    correct?

5 A. Yes, the totality of the circumstances are an important
6    part of the analysis, yes.

7 Q. Okay. And if a factor is different in one instant or the
8    other, that needs to be analyzed, for instance, it needs
9    to be of importance whether or not a suspect was
10   handcuffed behind their back, is that true?

11 A. I'm not clear on your question.

12 Q. Sure. When you assess a situation of the totality of
13   circumstances, you look not only of the officer's actions
14   on how he reacted, but you also look at the suspect or the
15   -- yeah, the fleeing suspect at that time, correct, given
16   in this case, correct?

17 A. I would look at everything by what's being analyzed is the
18   officer's decision to do what they do. So, yeah, that
19   becomes the primary factor based on the totality of the
20   circumstances as known to the officer at the time that
21   they act.

22 Q. Sure. I guess, all I'm asking is in general, it's fair to
23   say when you were shown that case, you looked at the --
24   looks like the opinion that you were given on that page,
25   correct?

**Page 122**

1 A. I don't understand your question, I'm sorry.

2 Q. Sure. The case that you were asked to review on the
3    screen today, Cutchin v. DC, do you recall that you were
4    asked by your attorney to review the yellow highlighted
5    version of that?

6 A. Yes, I was asked to review it. He's not my attorney by
7    the way, but yes, I understand.

8 Q. Excuse me, defense counsel.

9 A. I understand what you mean.

10 Q. Sorry. That's fine. All I'm asking, sir, is you were
11   shown this portion of the case, you can't rely upon it in
12   your opinions, correct?

13 A. That's true, I did not.

14 Q. And you didn't have time during your deposition today to
15   look at the case in particular with regard to whether or
16   not any facts on the totality of the circumstances are
17   different from the case Cutchin -- let me make sure I have
18   it right, Cutchin v. DC -- Cutchin vs. DC and the one that
19   we're here on today that you were asked to provide expert
20   opinion, correct?

21 A. That's true, yes.

22 Q. Okay.

23        MS. DeROUIN: I don't have any other questions.

24        (Deposition concluded at 1:11 p.m.)

25

**Page 123**

1                          ERRATA SHEET

2
3 Page/Line Number              Correction

4    _____          _____

5    _____          _____

6    _____          _____

7    _____          _____

8    _____          _____

9    _____          _____

10   _____          _____

11   _____          _____

12   _____          _____

13   _____          _____

14   _____          _____

15   _____          _____

16   _____          _____

17   _____          _____

18   _____          _____

19   _____          _____

20   _____          _____

21   _____          _____

22   _____          _____

23   _____          _____

24   _____          _____

25 DATE              SIGNATURE OF WITNESS.

**Page 124**

1            CERTIFICATE OF WITNESS

2
3
4 I, _____ the witness in the

5 foregoing deposition, do hereby certify that I have read

6 the deposition transcript of my testimony taken on

7 _____, 2022, and that subject to the

8 corrections and clarifications attached hereto, it is a

9 true and correct transcript of my testimony as given in

10 the hereof entitled cause.

11
12
13       WITNESS

14       Date

15
16 Subscribed and sworn to before me on.

17 _____.

18
19
20 Notary Public in and for _____ County.

21 My Commission expires_____

22
23
24
25